[Crim. No. 3334. In Bank.—October 20, 1930.]

THE PEOPLE, Respondent, v. EARNEST A. DIAS, Appellant.

W. W. Shea, Public Defender, and Hugh K. Forsman, Deputy Public Defender, for Appellant.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

SEAWELL, J.—The defendant was convicted of the double murder of Stanley Montaro and Mary Munoz, aged twenty-three and twenty years, respectively, committed in a suburban district of San Leandro, county of

Alameda, this state, on December 19, 1929. The indictment upon which he was convicted contained two counts, and the jury returned a verdict of guilty of murder of the first degree, without recommendation of imprisonment, upon both counts. The murdered persons were betrothed, and had parked the Chevrolet coupe, in which they were seated at the time they were fired upon, by the side of Holland Avenue, one of the several cross-roads in the locality in which the crime was committed, and which leads into the main thoroughfare of travel. The crime was committed approximately at 7:30 o'clock in the evening. The defendant, then twenty-four years of age, lived at the home of his mother and stepfather, situate in a fruit and agricultural district near the place where the crime was committed. The defendant and the victims of his deadly assault lived in the same community, at varying distances apart. It would seem that all of said parties had resided in the same vicinity since childhood, and a mutual acquaintance existed as to one another.

Three days after the commission of the crime the defendant made a confession of guilt, and related with considerable circumstance of detail the facts of the killing, which he repeated upon two or three other occasions, without material variation, to the officers of the law and the physicians called by the state to examine him as to his mental status. Later, however, he repudiated said confessions *in toto* and went to trial upon pleas of not guilty and not guilty by reason of insanity. His confessions were corroborated by certain definite physical facts and also by independent evidence adduced at the trial.

From the above sources of information it would appear that he was the owner of a .38-caliber revolver which was kept concealed under the mattress of a bed, and the cartridges were kept under another bed at the home. He claimed to have been the owner of two other revolvers, which he had purchased from an unnamed man who had recently arrived from Honolulu, but which remained in the possession of said stranger, as there was some talk between them with reference to a suggested bank robbery. However, on the evening in question he left his home at about 7 o'clock, taking with him said revolver and a number of cartridges, which he carried loosely in his pocket. Upon

leaving the home he loaded the revolver and walked through
a field to Holland Avenue. This and other avenues in the
district seem to have been preferred places of retreat for
youthful lovers, who frequently drew to the side of the
road and, bringing their cars to a stop, tarried for a time
in the seclusion which said less frequented avenues afforded.
This fact was well known to defendant, who referred to
such episodes as ''petting parties,'' the suggestiveness of
which seems to have inflamed his sexual passions to an
abnormal point. He stated in his confession that he went
upon the highway with the intention of compelling by force
of arms the submission of a female member of such a ''pet-
ting party'' to an act of sexual intercourse, holding at bay,
by threats and intimidation, her escort. Whether he had in
mind the parties whom he slew, or whether he recognized
them during the short interval that he was engaged in an
attempt to force them to submit to his commands—which
he denied—is not determinative from anything which ap-
pears in the record.

Shortly upon reaching Holland Avenue he observed the
Chevrolet coupe pass him, in which were seated said
couple. He observed it to presently draw up beside the
road, and he approached it on the side the man was seated,
stepped upon the running-board and, with drawn revolver,
intended to command ''Hands up!'' but got no further than
''Hands,'' when, to use his own words, the man ''got sore
and started to swear'' and made a forward motion, illus-
trating it, which caused the defendant to believe that the
man was about to draw a revolver, and he began shooting.
One version of the shooting was that he first shot the man,
then he shot the girl, then shot the man again and tried to
shoot the girl again, but missed the girl and hit the man.
In a statement made to one of the alienists he said that
when he first shot, the girl threw herself on the man to
save him and that accounts for the shot in her right side.
It is a fact that the bullet which struck the young lady
entered her right side. He also made a statement that he
ordered the man to take ''a walk.'' After the shooting he
ran across vacant land to his home. He wrapped the pistol
in a small sack, hid it, and went to bed. In his flight he
relieved himself of the extra cartridges which he had taken
with him and also threw from the revolver the four ex-

ploded shells. The young woman, who had been mortally wounded by a bullet which entered her body, made her way with great difficulty to a main thoroughfare, where she attracted the attention of the driver of a truck, who took her to San Leandro, and she was placed in the Highland Hospital for treatment. She died the next day a few minutes past noon. An attempt was made to take her statement about one hour before she expired, but it proved futile. Her companion was found dead in a reclining position behind the steering-wheel of the car with three bullet wounds in his body.

An investigation of the crime brought to light circumstances which pointed to the defendant. He was thereupon placed under arrest and two days thereafter confessed and gave a detailed statement of his actions prior to, at the time of and immediately subsequent to the murder. Several exploded and unexploded .38-caliber pistol cartridges were found at the places where he told the officers they would be found; the revolver, which had been recently discharged, was recovered at his home, as he had told the officers where it would be found; bullets in the undischarged shells corresponded in size and shape with those taken from the bodies of his victims; the number of shots fired into each body corresponded with his narrative of the shooting. Other corroborative evidence was added, which, taken in all, makes the proof against the defendant conclusive.

On the first or general issue of not guilty, the issue of legal competency was brought into the case by the defendant by his objection to the introduction in evidence of the confession which he had made, on the ground that he was mentally deficient and that he did not and could not have comprehended the significance of the statements and admissions which he was purported to have made, and, further, that any statements or admissions made by him were induced by intimidation and threats. On the issue of mental deficiency the defendant was permitted to introduce such evidence as he chose to present. He called as his witness Mrs. Grace M. Hunt, the Alameda County psychologist, who first came into official contact with the defendant in 1922 and again in 1925 and lastly a few days after the commission of the crime for which he was on trial. She estimated his mental age, by the tests which she applied, at ten years

and four months. The intelligence test which she used was a modification of the Binet system. Under such a system the one hundred per cent normal persons are rated between 14 and 16 years. There is no hard-and-fast rule by which results may be said to be exact, as the quotients are established by the process of approximation. His auditory memory was tested by repeating to him five numerals, with a slight pause between each, as, for example, 6, 9, 4, 8, 2, and then having him repeat them backward, or in reverse order. His answer was 2, 9, 6, and then he became lost. The next test consisted of 5, 2, 9, 6, 1. He began with 1 and went no further.

Such a test unexpectedly applied would most likely perplex the average person untrained in the permutation of figures, to say nothing of one who is troubled with the consciousness of an appalling crime, with its consequent effect immediately before him. His early trouble in 1922 and his commitment to the Sonoma State Home for the care of feeble-minded children, as the result of complaint having been made against him on account of his serious criminal conduct in 1925, and his release from said institution in 1927, were referred to by the witness. His mentality had improved somewhat since Mrs. Hunt first made observation of him, and she expressed no opinion as to his responsibility to the law.

Upon the trial of the issue of not guilty the prosecution offered in evidence the confessions of the defendant, one of which had been reduced to typewritten form by the stenographer who reported it. The defendant objected to the introduction of said confessions, or either of them, on the ground that he was wholly unable to understand, by reason of a congenital mental deficiency, the meaning, effect or force of said purported confessions. The trial court admitted evidence produced by the defendant as to his mental incompetency on the theory that it was the province of the jury to determine whether or not said confessions were understandingly made or could have been the products of a defective mind, such as the defendant was alleged to possess. The trial court limited such evidence to the sole inquiry as to whether the defendant possessed sufficient understanding to have comprehended the significance of his confession, was conscious of what he was saying and understood the

import of his words and acts and appreciated their significance. The court instructed the jury that they could not consider said confessions unless they were made by a mind which understood and appreciated their full import at the time they were claimed to have been made. The jury evidently impliedly found that the confessions were understandingly made, and accordingly gave them consideration. This evidence, while limited to the purpose indicated by the court, nevertheless brought an advantage to the · defendant which otherwise would have been denied him by authority of sections 1020 and 1026 of the Penal Code, which excludes, on the trial of the issue not guilty, all evidence tending to show the mental condition of the defendant at the time of the commission of the offense, in that from necessity it placed before the jury, upon the trial of the main issue, the mental status of the defendant. The raising of the issue of want of consciousness on the part of the defendant with respect to his confessions brought to the jury's consideration its right to exercise its discretion in affixing the penalty (sec. 190, Pen. Code) and determine whether a sentence of life imprisonment would better serve the requirements of the law in the circumstances of the defendant's mental status than would the imposition of the death penalty. ■ The section of the code above cited makes it the duty of the jury to affix, in the exercise of its discretion, the penalty in all murders which are of the first degree, but in none other. It is strictly a matter of fixing the punishment, and does not extend to the *degree* of crime.

The question, however, as to his responsibility to the law for his act will presently receive attention. It may be here stated that the confession was further opposed upon the ground that it was obtained by physical punishment inflicted upon him by one of the deputy sheriffs. He claimed that said officer told him on the day following the murders that if he did not "tell" he would kill him and he replied that he had nothing to do with the killing and further said that this "isn't the Hickman or the Dorothy Ellingson case." He further stated that said officer in an attempt to force a confession struck him upon the temple, upon the neck and stomach. This could not be true, as defendant's body was examined carefully for specific purposes by alien-

ists and physicians covering the period fixed by the defendant and afterward and no indications of any marks or bruises were visible upon his person. In fact, his belated accusation was made after he had concluded to repudiate his confession, and it is also in direct contradiction of statements made to the foreman of the grand jury and several other persons that he had been well treated during his confinement. The officer denied that any threats or violence were employed by him to induce the confession. There is nothing in the record that would cause us to doubt his testimony, which finds corroboration in the evidence.

The same jury which returned the verdict of guilty was retained to try the issue of not guilty by reason of insanity. By virtue of section 1027 of the Penal Code, the trial judge appointed three alienists with wide experience to examine the defendant and investigate his sanity. One of said alienists was the medical superintendent of the State Hospital at Napa and the other two were well-known alienists of the county of Alameda who had long experience in the treatment of the insane. In addition to said three alienists appointed by the court, the People called the medical superintendent of the Sonoma State Home, at which institution the defendant was an inmate for approximately two years; the former family physician of the defendant's parents; and the director of hospitals of Alameda County, who has had much psychopathic experience, all of whom devoted much study and time to the mental status of the defendant. Without attempting to review the testimony of the said several witnesses, it may be said that they were unanimous, except one, who apparently, through inadvertence, was not called upon to express an opinion, that the defendant was legally responsible for the crime of which he stood convicted.

Throughout the larger part of his life the defendant has been antisocial and involved in numerous highly mischievous, if not positively criminal acts. From the story of his life as unraveled by him it appears that the defendant attended the common schools from eight to fifteen years of age, at which time he had occasional trouble with his teachers on account of attendance derelictions, which resulted in his quitting school and seeking employment as a dairy or farm hand. He first came to the attention of the

Alameda peace officers in 1922 by reason of petty thefts and other petty offenses in which he, with others, was implicated. He again came before the law in 1925, charged with placing a telephone or telegraph pole across the track of the Western Pacific Railroad Company, which resulted in his commitment to the Sonoma State Home for training and discipline. He was paroled in 1927. He did not fit well into the home life and he appears to have harbored unfriendly feeling against his stepfather, and in one or two instances against his mother, also. It would seem that he resented the adverse criticism made against him in the community by reason of having been an inmate of the home. The several examinations which the alienists made were unusually thorough and searching, and covered a wide range of subjects, including his personal and family history. His memory proved to be unusually good, in fact, one of the alienists described it as a photographic memory. He was good in mathematics and accurate in dates, and in a logical and sequential manner discoursed on events and their results. He appears to have grown more aggressive in his sex relationships during the past few years of his life. He denied that he had delusions or that there was any mental or nervous trouble in his history or his family's history. After leaving school he engaged in dairy, farm and orchard work, did his own bargaining, and at the date of his crime or shortly before he had more than $300 on deposit with a neighborhood bank. While he may be mentally deficient, as most persons who commit crime are held to be by alienists, all of the medical skill called into the case pronounced him unquestionably responsible as a moral agent. He knew that it was wrong and a violation of the moral and legal codes to commit murder and that the law's penalty included the possibility of the infliction of the death penalty against those who unlawfully take human life, all of which appears in the record.

In addition to the opinions expressed by the alienists as to the legal responsibility of the defendant, his confession, as taken by questions and answers, and his testimony as a witness on his own behalf at the trial are before us. There is nothing in his statements or testimony that would justify this court in holding that his mentality was deficient or impaired to the degree that he did not fully understand

the nature and quality of the acts which he committed or did not know that he was doing wrong in committing them. We have carefully read the record in the case and find no prejudicial errors were committed at the trial. The learned trial judge was liberal in his rulings and specially called to the attention of the jury that it was in their power to relieve the defendant of the extreme penalty of the law by the following instruction:

"The punishment for murder in the first degree is death, or confinement in the State Prison for life, at the discretion of the jury trying the case. The law prescribes no rules or tests for the guidance of jurors in the exercise of its discretion in determining whether the greater or lesser penalty shall be inflicted, but leaves the question of punishment solely to the conscience and sound judgment of the jury.

"If the jury determines that the punishment shall be mitigated, that is, to life imprisonment in State Prison, then the verdict must distinctly state such punishment, for if nothing is said in the verdict as to the punishment, then always the court imposes the penalty of death."

The law is so thoroughly settled as to the kinds of mental disorders or mental incompetency which will relieve a defendant from punishment for his acts that it is not necessary to do more than cite a few of the more recent cases. (*People* v. *Willard,* 150 Cal. 543 [89 Pac. 124]; *People* v. *Sloper,* 198 Cal. 238 [244 Pac. 362]; *People* v. *Perry,* 195 Cal. 623 [234 Pac. 890]; *People* v. *Hickman,* 204 Cal. 470 [268 Pac. 909, 270 Pac. 1117]; *People* v. *Trouche,* 206 Cal. 35 [273 Pac. 767]; *People* v. *Leong Fook,* 206 Cal. 64 [273 Pac. 779].)

Measured by the law's standard, the jury found the defendant to be responsible for his crimes and with a full instruction before them as to their power to relieve him of the death penalty they refused to exercise said discretion in favor of the imposition of the lesser punishment.

The validity of sections 1017, 1020 and 1026 of the Penal Code, which provide the order and procedure which shall govern trials in which insanity is made a ground of defense and which also provide that upon the trial of the general issue of "not guilty" the defendant shall be conclusively presumed to be sane, have been so fully discussed by the

two cases last above cited that it is sufficient merely to cite them.

We find nothing in the record that would warrant us in disturbing the verdicts of the jury and the judgments.

The judgments and orders appealed from with respect to both counts of the indictment are affirmed.

Richards, J., Shenk, J., Preston, J., Waste, C. J., and Curtis, J., concurred.

LANGDON, J., Concurring.—On the record before me I am compelled to concur in the judgment. I do so with the utmost reluctance, and solely because of the limitations upon this court in its review of criminal proceedings. I think that the matter of sentence should receive careful consideration by the chief executive of the state in the event that an application for such relief should come before him, for he alone may grant relief where we are powerless to act. It has heretofore been determined that the defendant was so deficient in mentality as to require his confinement in the Sonoma State Home for the Feeble Minded; and at the time when this crime was committed he was on parole from that institution. To me it appears monstrous that the state should execute one of its own wards, who should never have been set at liberty, and who at the time of this tragic event was still under surveillance as a mental defective.