[Crim. No. 19933. Oct. 10, 1978.]

In re RAMON M., a Person Coming Under the Juvenile Court Law.
KENNETH F. FARE, as Acting Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
RAMON M., Defendant and Appellant.

420

## COUNSEL

Paul Halvonik, State Public Defender, and Charles M. Sevilla, Chief Assistant State Public Defender, for Defendant and Appellant.

William S. Greene, Wylie A. Aitken, Edward I. Pollock, William P. Camusi and Leonard Sacks as Amici Curiae on behalf of Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**TOBRINER, J.**—Penal Code section 26 codifies the rarely used defense of idiocy as well as the better known defense of insanity. The California courts until recently have employed the same standard, the M'Naghten test,[1] to govern both defenses. In *People* v. *Drew* (1978) *ante* page 333 [149 Cal.Rptr. 275, 583 P.2d 1318], however, this court repudiated the M'Naghten test of insanity and adopted instead the American Law Institute (ALI) formulation: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Model Pen. Code (Proposed

---

[1] "To establish a defense on the ground of insanity it must be clearly proved that, at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case* (1843) 10 Clark & F. 200, 210 [8 Eng.Rep. 718, 722].)

Official Draft 1962) § 4.01, subpart (1).) The ALI test, with its reference to "mental defect," was carefully drafted to encompass any defense based upon the idiocy or mental retardation of the defendant. We therefore adopt the ALI test to govern the defense of idiocy as well as the defense of insanity.

Understandably, in view of our past adherence to M'Naghten, neither defendant's expert witness, counsel, nor the trial court evaluated defendant's capacity in terms of the ALI standard. Since substantial evidence supports the proposition that defendant, a retarded fourteen-year-old with a mental age of about five or six, lacked the capacity to conform his conduct to legal requirements, we conclude that the failure to employ the ALI test was prejudicial; we reverse the judgment finding defendant to be a person described by section 602 of the Welfare and Institutions Code.

With respect to defendant's other contentions, we hold that the presumption of Penal Code section 26 that a child under the age of 14 is incapable of committing a crime refers to chronological age, not mental age, and hence does not apply to him. Finally, having determined that the trial court's adjudication must be reversed for failure to employ the ALI test to define the defense of idiocy, we do not resolve defendant's contention that the trial judge should have declared a doubt respecting defendant's competency to stand trial. If defendant is again brought to trial, the court may inquire into defendant's competency at that time.

### 1. *Statement of Facts.*

Defendant, a 14-year-old youth, appeals from a decision of the juvenile court finding him to be a person described by section 602 of the Welfare and Institutions Code and declaring him to be a ward of the court pursuant to that section.[2]

At 1:45 a.m. on May 22, 1976, one Ricardo Hernandez was walking on the sidewalk in Los Angeles. Three youths, including defendant, attacked Hernandez, striking him with their belts. Hernandez took refuge in a passing tow truck. The driver radioed for police assistance; when the police arrived the truck driver pursued and caught defendant.

---

[2]Section 602 applies only to minors found to have violated a law. Defendant had previously been declared a ward of the juvenile court pursuant to former Welfare and Institutions Code section 600 (now Welf. & Inst. Code, § 300), which applies to minors who are not receiving or cannot receive proper care at home.

Defendant was charged with violating Penal Code section 415, subdivision (1), which declares that "Any person who unlawfully fights in a public place or challenges another person in a public place to fight" is guilty of a misdemeanor, and with a violation of a city curfew ordinance. At the juvenile court hearing defendant did not deny the charges, but presented a defense of idiocy.[3] He called as his witness Dr. Michael Maloney, a clinical psychologist and associate professor of psychiatry at the Los Angeles County U.S.C. Medical Center. In response to a hypothetical question by defense counsel, Dr. Maloney stated that in his opinion defendant was not of "sound mind." Dr. Maloney explained that defendant has an IQ of 40-42, an extremely low level of intelligence, and a mental age equivalent to a 5- or 6-year-old child. Defendant cannot read or tell time and is entirely incapable of abstract thought. He also suffers from a severe speech impediment.[4] Dr. Maloney later volunteered that "I doubt that he [defendant] has much awareness of this whole proceeding," an observation which will assume significance when we turn to defendant's contention that he was not competent to stand trial.

Upon cross-examination, Dr. Maloney stated that defendant was aware of the nature and quality of his act—the assault upon Hernandez—and that petitioner knew that an unprovoked assault upon another person was wrong, but that because of his low intelligence he was extremely suggestible. If urged to commit an assault by persons whom he trusted, defendant would probably believe that the assault was right.

Mrs. Betty Wise, a child services worker with the county department of social services, testified that she had interviewed defendant at the juvenile hall. In that interview defendant indicated that he knew that it was wrong to run away from juvenile hall, to steal someone's property or to assault someone.

Defendant testified briefly. When asked what would happen if he stole or hit someone, he responded that he would have to go to court. When

[3] Penal Code section 26 states that "All persons are capable of committing crimes except those belonging to the following classes:

"Two—idiots.
"Three—Lunatics and insane persons."
Insanity is a defense in a juvenile court section 602 proceeding (*In re M. G. S.* (1968) 267 Cal.App.2d 329, 336 [72 Cal.Rptr. 808]); the Attorney General concedes that idiocy should also be a defense in such a proceeding.

[4] His performance on certain psychological tests suggested organic brain damage.

defense counsel asked him whether going to court was all that happens if he does something wrong, he responded affirmatively.

At the close of testimony the juvenile court judge dismissed the count charging a violation of curfew because of defendant's inability to tell time. The court, however, concluded that defendant was of sound mind, not an idiot, and consequently found that he wilfully and unlawfully fought in a public place in violation of Penal Code section 415. The court then declared defendant a ward of the juvenile court pursuant to section 602. He appeals that order.

2. *We adopt the A.L.I. test, as stated in section 4.01, subpart (1) of the Model Penal Code, to define the defense of idiocy.*

The California Penal Code codifies defenses based upon mental incapacity. First providing that "[i]n every crime . . . there must exist a union . . . of act and intent" (Pen. Code, § 20), the code then asserts that for persons of "sound mind" the intent "is manifested by the circumstances connected with the offense. . . ." (Pen. Code, § 21.) Section 21 defines "sound mind" by exclusion: "All persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity." Finally, section 26 lists those who are incapable of committing crimes, and includes among those listed "Idiots" and "Lunatics and insane persons." Summarizing these provisions, we conclude that under the California Penal Code idiots, lunatics, and insane persons are not of sound mind, cannot entertain general criminal intent, and therefore cannot commit criminal acts.

Although the Legislature has thus established idiocy, lunacy, and insanity as defenses to crime, it has never attempted to define those terms.[5] This court in *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d

[5]We are not certain why the 1872 Legislature listed idiocy, lunacy, and insanity as separate forms of mental incapacity. The language of the 1872 codification appears to have been taken from the Crimes and Punishment Act of 1850 (Stats. 1850, ch. 99), which stated in part that "A person shall be considered of sound mind who is neither an idiot, nor lunatic, nor affected with insanity. . . ." No legislative history is available for the 1850 enactment. With respect to the 1872 codification, the Code Commissioners' notes regarding the defense of idiocy cites only Wharton's criminal law text. That text, however, treats insanity as a generic term, with idiocy as merely one form of insanity. (See 1 Wharton, Criminal Law (4th ed. 1857) p. 121.) Similarly, Deering's Annotations to section 26 in the 1885 edition of the Penal Code states that "Insanity . . . in modern

492], defined idiocy as "Extreme deficiency in intelligence, commonly due to incomplete or abnormal development of the brain." (51 Cal.2d, at p. 729, fn. 10.) Our opinion in *Drew* observed that the term "lunatics" probably referred to mentally ill persons who had lucid intervals; "insane persons" to those who lacked lucid intervals. (*People* v. *Drew, supra, ante,* p. 340, fn. 6.) But as *Gorshen* pointed out, although such "dictionary definitions" may serve to distinguish various abnormal mental states from each other, they are not helpful in defining the degree of incapacity which renders a defendant not legally responsible for criminal conduct. (See 51 Cal.2d, at p. 729.) Thus "the task of describing the circumstances under which mental incapacity will relieve a defendant of criminal responsibility has become the duty of the judiciary." (*People* v. *Drew, supra, ante,* p. 340.)

In discharging that responsibility, the judiciary has not found it necessary to fashion separate tests for the defenses of idiocy, lunacy, and insanity. Because all those terms describe mental conditions which render a defendant not "of sound mind," a single test, defining the degree of mental incapacity which renders a person incapable of crime, will suffice to instruct the jury on each of these defenses.[6] Accordingly, the California courts have employed a single standard, which until recently was the M'Naghten test, to define the defenses of idiocy, lunacy, and insanity.

---

times, has been used to designate all mental impairments and deficiences, and includes in it the terms 'lunacy,' 'idiocy' and 'unsoundness of mind.' The common law originally recognized but two kinds of insanity, idiocy and lunacy, the subjects of which were designated by the term 'non compotes mentis.' "

It is difficult to draw any affirmative conclusions from the legislative history of the 1872 codification. But we can at least reach the negative conclusion that the Legislature's enactment of separate defenses of idiocy, lunacy, and insanity does not necessarily signify that the Legislature intended idiocy and lunacy to be governed by a separate test than insanity, or even that it considered these conditions to be separate and distinct mental states.

[6]Defendant cites dictum from *People* v. *Baker* (1954) 42 Cal.2d 550, 569-570 [268 P.2d 705], as suggesting a separate legal test for idiocy and insanity. Criticizing a confusing instruction in which the jury was told that a defendant was presumed "sane and of sound mind," *Baker* said that "It is expressly provided in section 21 of the Penal Code that idiots and lunatics are not of sound mind; yet, if soundness of mind and legal sanity are synonymous, the express provisions of section 26 exempting idiots and lunatics from criminal responsibility would be superfluous because they would necessarily be included within the provision exempting the insane." (*Id.,* at p. 569)

Taken in context, the quoted language of *Baker* asserts only that a presumption of sanity does not constitute a presumption of soundness of mind because the person in question might be of unsound mind as a result of idiocy or lunacy. We agree; even if lunacy cannot readily be distinguished from insanity, idiocy or mental retardation is a condition conceptually distinct from insanity or mental illness. Both mental retardation and mental illness, however, are conditions which impair the person's capacity to commit crime; thus a single test of mental incapacity or, if you will, "unsoundness of mind," suffices to instruct the jury on both conditions.

Although numerous cases proclaimed M'Naghten as the test of insanity,[7] only three decisions have discussed mental retardation as a distinct basis for a criminal defense. In *People* v. *Oxnam* (1915) 170 Cal. 211 [147 P. 165], the first of these cases, the court upheld an order denying a new trial. In language derived from the M'Naghten test, it stated that the evidence "shows to us no substantial basis for a conclusion that appellant was so mentally deficient that he was incapable of distinguishing between right and wrong with relation to the act with which he was charged." (170 Cal., at p. 213.) *People* v. *Keyes* (1918) 178 Cal. 794 [175 P. 6] stated in dictum that "Imbecility is no defense against crime unless its existence deprives the individual of the power to distinguish between right and wrong." (178 Cal., at p. 801.) Most recently in *People* v. *Fisher* (1975) 49 Cal.App.3d 174 [122 Cal.Rptr. 366], the court rejected a claim charging the incompetency of defendant's counsel for failing to present a defense of idiocy on the ground that the evidence, although establishing mental deficiency, did not show that the defendant could not distinguish right from wrong. (49 Cal.App.3d, at p. 178.)[8]

In *People* v. *Drew, supra, ante,* page 333, we rejected the M'Naghten test as a test of insanity. We there explained the deficiencies in M'Naghten which demonstrated its inadequacy: M'Naghten's exclusive emphasis upon the defendant's cognitive capacity without regard for his lack of volitional control; its failure to recognize degrees of incapacity; its stultifying effect upon psychiatric testimony. These same deficiencies speak against the continued use of M'Naghten as a test of the defense of idiocy.

Moreover, to maintain M'Naghten as a test of idiocy, now that it has been replaced by the ALI standard as a test of insanity, would give rise to difficult and unnecessary complications. A defendant who knew that his act was wrong, but was unable to conform to legal requirements, would be acquitted if his incapacity arose from mental illness but convicted if it arose from mental retardation—a discrimination difficult to justify. Juries, confronted with two different tests, would be compelled to determine the source of a defendant's mental incapacity; experts would debate whether disabling conditions which arose during childhood

[7]California adopted the M'Naghten rules in *People* v. *Coffmann* (1864) 24 Cal. 230, 235, and continued to follow M'Naghten as a test of insanity until *People* v. *Drew, supra, ante,* page 333. No decisions have discussed lunacy as a separate defense; the courts apparently have subsumed that defense under the concept of insanity.

[8]See also *People* v. *Dias* (1930) 210 Cal. 495 [292 P. 459], and *People* v. *Norton* (1934) 138 Cal.App. 70 [31 P.2d 809]. In both cases a mentally retarded defendant pled not guilty by reason of insanity, and the court employed the M'Naghten test to review the evidence supporting the finding of sanity.

constitute insanity or idiocy; courts would ponder the case of the retarded person who is also mentally ill.

Such difficulties can be avoided by continuing to employ the same test for the defense of idiocy as governs the defense of insanity.[9] Having held in *People* v. *Drew, supra, ante,* that the defense of insanity will hereafter be governed by the ALI test—a test which, as we shall explain, was carefully crafted to encompass incapacity arising from mental retardation—the logical and practical answer is to adopt that test to govern the defense of idiocy.[10]

The ALI test refers to incapacity resulting from "mental disease or *defect.*" (Italics added.) This phrase stems from the opinion of Judge Bazelon of the District of Columbia Circuit in *Durham* v. *United States, supra,* 214 F.2d 862. He defined those terms as follows: "We use 'disease' in the sense of a condition which is considered capable of either improving or deteriorating. We use 'defect' in the sense of a condition which is not considered capable of either improving or deteriorating and which may be either congenital, or the result of injury, or the residual

---

[9]Every jurisdiction to consider the matter employs the same test for insanity and for defenses based on mental retardation. Those jurisdictions which follow the M'Naghten test for insanity apply that test to govern defenses of mental deficiency. (See 1 Anderson, Wharton's Criminal Law and Procedure (1957) § 41; Annot. (1926) 44 A.L.R. 584 and 4 cases collected in Later Case Service.) When the District of Columbia Circuit followed the Durham test of insanity (see *Durham* v. *United States* (D.C.Cir. 1954) 214 F.2d 862), it employed the same test for any defense of mental retardation. (See *McDonald* v. *United States* (D.C.Cir. 1962) 312 F.2d 847.) As explained later in this opinion, the ALI test encompasses both mental illness and mental retardation; thus when the District of Columbia Circuit abandoned the Durham test and adopted ALI it noted that the new test would govern cases of retardation as well as mental illness. (*United States* v. *Brawner* (D.C.Cir. 1972) 471 F.2d 969, 983.)

[10]Although Penal Code sections 21 and 26 appear to establish a defense of idiocy separate from that of insanity, neither statute nor reported decisions indicate how that defense should be raised and tried. When the Legislature established procedures for the assertion and trial of the defense of insanity (Pen. Code, §§ 1016, 1017, 1026, 1027) and for the confinement and treatment of those found not guilty by reason of insanity (Pen. Code, §§ 1026, 1026a, 1026.1) it probably intended those statutes to apply to all persons who assertedly lack mental capacity to commit crime. (See Louisell & Hazard, *Insanity as a Defense: The Bifurcated Trial* (1961) 49 Cal.L.Rev. 805, 809-810.) In light of this legislative intent, and of the identity of the legal test for idiocy and insanity under both the M'Naghten rules and the ALI standard, we conclude that the term "insanity" in Penal Code sections 1016 through 1027 refers to mental incapacity, whether arising from mental illness or mental retardation. Accordingly a defendant asserting a defense of idiocy should raise that defense by separate plea (see Pen. Code, §§ 1016, 1017), may obtain a bifurcated trial (see Pen. Code, § 1026), must prove his incapacity by a preponderance of the evidence (cf. *People* v. *Drew, supra, ante,* at p. 348), and if successful is subject to confinement as provided in sections 1026, 1026a, and 1026.1.

effect of a physical or mental disease." (214 F.2d, at p. 875.) Subsequently in *McDonald* v. *United States, supra,* 312 F.2d 847, the District of Columbia Circuit applied the concept "mental disease or defect" to a defendant of subnormal intelligence, explaining that the concept "includes any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs behavior controls." (312 F.2d, at p. 851.)

The *Durham* definition of mental "defect," as further elucidated in *McDonald,* plainly encompasses mental retardation as well as incurable mental illness. Consequently commentators have viewed the ALI adoption of this language as designed to demonstrate that the ALI test includes incapacity arising from mental retardation. (President's Committee on Mental Retardation, The Mentally Retarded Citizen and the Law (1976) p. 632.)

In sum, it is unnecessary for us to fashion separate standards for the defenses of insanity and idiocy or to encounter the difficult theoretical and practical problems which such separate standards would create. The ALI test, already adopted by this court in *Drew,* serves to define all defenses of mental incapacity, and thus encompasses both idiocy and insanity. ■ We conclude that the defense of idiocy proffered by defendant in the present case is defined by the ALI standard, and that defendant's mental retardation constitutes a defense to criminal conduct if "at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Model Pen. Code (Proposed Official Draft 1962) § 4.01, subpart (1).)[11] As in *People* v. *Drew, supra, ante,* our decision applies retroactively to cases in

---

[11] We explain briefly our reasons for rejecting two other proposed tests of idiocy. First, defendant suggests that the test of idiocy should turn on whether a defendant is of "sound mind," and quotes *People* v. *Baker, supra,* 42 Cal.2d 550, 568, which defined a "sound mind" as one "free from flaw, defect, or decay, perfect of the kind; undamaged or unimpaired; healthy, not diseased or injured." This definition of a sound mind is not a suitable standard for a criminal defense; to define "sound mind" as one "free from flaw," "unimpaired," indeed one "perfect of the kind" would impose so high a criterion that criminal responsibility would become the exception instead of the norm.

We reject also the suggestion that idiocy for the purpose of a criminal defense be defined solely by intelligence testing. Many psychologists believe that such tests, standing alone, are an inadequate measure of the degree of mental retardation or the individual's ability to conform to legal requirements. (See Roos, Basic Facts About Mental Retardation in Legal Rights of the Mentally Handicapped (Ennis & Friedman, 1973 ed.) p. 19; Allen, Toward an Exceptional Offenders Court (1966) 4 Mental Retardation 3, 5-6.)

which the defendant raised a defense of idiocy and to those cases that have not yet come to trial as of the date of the finality of this opinion.[12]

3. ■ *Defendant is not entitled to the presumption of incapacity applicable to children under the age of 14.*

Penal Code section 26 provides that among those incapable of committing crimes are "children under the age of 14 in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness." Defendant maintains that section 26 should be interpreted to refer to mental age, not chronological age; he argues that his mental age of five renders him incapable of committing crimes. Defendant's proposed interpretation of section 26, however, conflicts with the decisions interpreting that section; moreover, since it would exempt from criminal responsibility a substantial proportion of the adult and adolescent population, it is unworkable.

Arguments essentially identical to those raised by defendant today were presented to this court in *People* v. *Oxnam, supra,* 170 Cal. 211 and *People* v. *Day* (1926) 199 Cal. 78 [248 P. 250]. In *Oxnam* the trial court rejected a defense based on mental deficiency; defendant then moved for a new trial, submitting an affidavit showing him to have a mental age of eight. We affirmed the trial court's order denying that motion. In *People* v. *Day* defendant also moved for a new trial based upon affidavits showing that his mental age was that of a child under 14. We responded that "Section 26 of the Penal Code, subdivision 1, is not susceptible of the constrained construction contended for by the defendant . . . . Said section clearly refers to the physical age of a *child* and has no reference to the mental or moral age of an adult." (199 Cal. 78, 87.)

The concept of "mental age" derives from intelligence testing. Although a person may grow in wisdom and experience throughout life, one's capacity to learn does not significantly increase beyond the age of 18. Thus the "mental age" of the average adult under present norms is approximately 16 years and 8 months. (See Terman & Merrill, Stanford Binet Intelligence Scale with revised 1972 tables of norms by Robert L. Thorndike (1973) p. 426.) Approximately 16 percent of the adult population and a much higher percentage of adolescents between ages 14 and 18 have "mental ages" below 14 years. Under defendant's proposed

---

[12]Language in *People* v. *Oxnam, supra,* 170 Cal. 211, *People* v. *Keyes, supra,* 178 Cal. 794, and *People* v. *Fisher, supra,* 49 Cal.App.3d 174, inconsistent with this opinion is disapproved.

interpretation of section 26 all such persons would be presumed incapable of committing crimes.

Contrary to defendant's assertion we find nothing unreasonable in interpreting section 26 to refer to chronological age. Experience and maturity play as important a part as intelligence in determining an individual's ability to conform to the law. The Legislature could reasonably presume that any person of sound mind who reaches the age of 14 has acquired the ability to observe legal requirements; if by reason of mental disease or defect a particular individual has not acquired that ability his remedy is a defense based on idiocy or insanity.[13]

4. *Having resolved this appeal on other grounds, we do not determine whether the trial court abused its discretion in failing to declare a doubt as to defendant's competency to stand trial.*

Although no one suggested at trial that defendant was incompetent to stand trial, defendant now contends on appeal that the trial court should have declared a doubt on the matter *sua sponte* and ordered a hearing to determine that question. (See Pen. Code, § 1368.)[14] Defendant notes generally the evidence of his low intellectual ability, but puts primary stress on the testimony of Dr. Maloney, who stated that "I doubt that he [defendant] has much awareness of this whole proceeding." Yet that statement, volunteered by Dr. Maloney on redirect examination, entered the record without further explanation or amplification, and contrasted with the later testimony by both defendant and Mrs. Wise, the children services worker, indicating that defendant did have some understanding of the proceeding.

Under these circumstances, a question arises whether the trial court abused its discretion (see *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 283 fn. 10 [61 Cal.Rptr. 644, 431 P.2d 228]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [508 Cal.Rptr. 374, 426 P.2d 942]) in failing to declare *sua sponte* a doubt respecting defendant's competency to stand trial. Since we

[13]Our interpretation of section 26 is consistent with the common law, under which a minor "who has reached the age of fourteen has the same criminal capacity as an adult, that is, he is fully accountable for his violations of law unless incapacity is established on some other basis such as insanity." (Perkins, Criminal Law (2d ed. 1969) p. 837.) (Fns. omitted.)

[14]Because the "conviction of an accused person while he is legally incompetent violates due process" (*Pate* v. *Robinson* (1966) 383 U.S. 375, 378 [15 L.Ed.2d 815, 818, 86 S.Ct. 836]), the state concedes that the protective reach of Penal Code section 1368 extends to section 602 proceedings in juvenile court.

reverse the trial court's adjudication on other grounds, we need not resolve that issue. If defendant is again brought to trial the court may at that time, pursuant to section 1368, inquire into his competency.[15]

### 5. *Disposition of this appeal.*

It is not surprising, in view of the fact that we had not then endorsed the ALI test of mental capacity, that neither witnesses nor counsel structured their presentation at trial in terms of defendant's capacity to conform to legal requirements. The trial record nevertheless adduces substantial evidence of defendant's incapacity. His extremely low intelligence, his inability to engage in abstract reasoning, and his suggestibility present a picture of someone who lacks the capacity to prefer the high abstract principle of obedience to law over the malign urgings of his companions.

Although the trial judge did not state the standard he employed in finding defendant mentally competent, we cannot presume that he utilized the ALI test which this court had not yet approved. If he had employed the ALI test, we believe it probable that he would have upheld defendant's defense of idiocy. Concluding, therefore, that the court's failure to adjudge defendant's capacity by the ALI standard was prejudicial (see Cal. Const., art. VI, § 13), we reverse the judgment finding defendant to be a person described by section 602 of the Welfare and Institutions Code.

The judgment is reversed.

Bird, C. J., Mosk, J., and Jefferson, J.,* concurred.

**RICHARDSON, J.**—I respectfully dissent. As I have indicated in my dissenting opinion in the case of *People* v. *Drew, supra, ante,* page 333 at page 353 [149 Cal.Rptr. 275, 583 P.2d 1318], I believe that the majority, by repudiating the modified California M'Naghten test of insanity and adopting instead the American Law Institute (ALI) formulation, has invaded the responsibility of the Legislature. Having once committed

---

[15]Amicus asserts that the juvenile court failed to follow the procedures of section 1370.1 for confinement of the developmentally disabled. Those procedures, however, apply only to a defendant already found incompetent to stand trial, and thus have no bearing on the present appeal.

*Assigned by the Chairperson of the Judicial Council.

itself to redrafting this area of the law, the majority is now obliged to forge ahead and judicially extend the ALI test to the defense of idiocy, in order to eliminate the inevitable complications which would ensue were different standards to govern the defenses of idiocy and insanity.

In addition to the numerous inadequacies in the ALI test expressed in my *Drew* dissent, the ALI test does not satisfactorily dispose of the problem, present also in the original M'Naghten formulation, of the dominant role in the case played by expert witnesses who are permitted to testify as to the ultimate fact of criminal responsibility. This result has also been widely criticized, and is illustrated precisely by the present case. Here, the clinical psychologist called by the defense testified that defendant was aware of the nature and quality of his act—the assault upon Hernandez—and that defendant knew that an unprovoked assault upon another person was wrong. However, the psychologist also stated that because of his low intelligence the defendant was extremely susceptible to suggestion and if urged to commit an assault by persons whom he trusted, he would probably believe that the assault was proper.

The original M'Naghten standard provides that "To establish a defense on the ground of insanity it must be clearly proved that, at the time of committing the act, the party accused was labouring under such a defect of reason, from disease of mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong." (*M'Naghten's Case* (1843) 10 Clark & F. 200, 210 [8 Eng.Rep.718, 722].)

Judged by the M'Naghten standard defendant would not be relieved of his criminal responsibility since the testimony of the defense psychologist established that defendant was aware of the nature and quality of his act and knew that it was wrong. Without any contrary evidence the testimony of the psychologist is fully determinative on the issue of criminal responsibility.

The majority, while decrying what it characterizes as the M'Naghten test's "stultifying effect upon psychiatric testimony," (*ante*, p. 426) here eagerly adopts a test which once again entrenches the expert witness in a position in which his answer to the somewhat different question, regarding the defendant's ability to conform his actions, will again be virtually dispositive of the issue of criminal responsibility. This fact simply illustrates again that more thought in a legislative forum would produce a better result.

As I suggested in *Drew,* this is an excellent time for us to exercise judicial restraint. Doubtless, proposed legislative changes will embrace the defense of idiocy as well as insanity. We should resist the allure of an instant but questionable resolution of this most troublesome issue and defer to the admittedly slower but undoubtedly more circumspect process of legislation. Our repeated expressions to this effect were correct.

Clark, J., and Manuel, J., concurred.