**Opinion issued October 25, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-01067-CV

————————————

## IN THE MATTER OF J.W., Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-05444J**

---

## MEMORANDUM OPINION

This is an appeal from an adjudication that appellant J.W. engaged in delinquent conduct by participating in an aggravated robbery when he was fifteen years old. J.W. raises two points on appeal. First, J.W. contends that the trial court

lacked jurisdiction to adjudicate him delinquent because it has jurisdiction only over persons between the ages of ten and seventeen, and J.W.'s mental age at the time of the offense was less than ten years. Second, he maintains that because the Texas Legislature has determined that a child may not be found criminally responsible before the age of ten years, a child with a mental age less than ten cannot be held criminally responsible as a matter of law. We affirm.

## Background

On June 18, 2009, three men robbed Desiree Hernandez, the only teller working in the lobby of the United Energy Credit Union, at gunpoint. Two of the men, one of whom Hernandez later identified as J.W., jumped over the counter, pointed their guns at her, and demanded that she give them all the money. Afraid that they would kill her, Hernandez handed the men approximately $12,000. The men told Hernandez not to look at them and ordered her to get on the ground. After the men left, Hernandez pushed the panic button.

Members of the Houston Police Department were called to the scene and, after viewing the surveillance video of the robbery, discovered that one of the men touched the plastic wall at the teller station. Police officers were able to lift a fingerprint from the teller station wall and that fingerprint was identified as belonging to J.W., who was fifteen at the time of the robbery. The State charged J.W. by determinate petition, in juvenile court, with aggravated robbery.

2

Before the bench trial began, the trial court conducted a hearing on J.W.'s motion to suppress his recorded statement and his motion to dismiss for lack of intent or responsibility, based on his mental age, which J.W. contends is less than ten. At the hearing, J.W. also argued, because J.W. had a mental age of less than ten, that the trial court lacked jurisdiction to hear the matter.

Dr. Diane Wood, the chief psychologist for the Mental Health Mental Retardation Authority of Harris County, Child Adolescence Forensic Division, testified at the hearing that she supervised the testing conducted on J.W. in July 2009, after the robbery occurred. She explained that several tests were performed on J.W. in 2009, including the Wechsler Intelligence Scale for Children, the Wide Range Achievement Test, the Street Skill Survival Questionnaire, and the Bender-Gestalt test. She explained that there are three requirements for a child to be diagnosed with mental retardation: (1) the child has to be under the age of eighteen; (2) the child has to score under or around seventy on an individually administered IQ test; and (3) there must be a concurrent deficit in adaptive functioning, which can be judged by whether the child can adapt to change or tell time. Dr. Wood testified that J.W. produced a full scale IQ of 40 on the Wechsler Intelligence Test, which shows that he functions between a kindergarten and first grade level. However, she noted that his achievement scores in 2008 placed him at a fifth grade reading level and a tenth grade spelling level. She testified that the

3

Street Skill Survival Questionnaire is a test of adaptive functioning and that J.W. has a survival skills quotient of 10, which is described as profoundly mentally retarded. Finally, she testified that he scored at the level of a seven-and-a-half year old on the Bender-Gestalt Test, which is a visual spatial motor skills test.

Dr. Wood testified that, according to the testing, J.W. appeared to be functioning at a moderate range of mental retardation and that he seemed to be functionally illiterate. She further testified that he did not have adequate skills to function independently in daily living. However, Dr. Wood explained that, because there were so many discrepancies in the test scores from his first testing in 2008 and the testing that was done later, she was comfortable concluding only that J.W. functions at the mild mental retardation range, which she said, if valid, would mean he was functioning at the level of a ten or eleven year old. Some of the abilities that she observed in the office during the evaluation were inconsistent with J.W.'s adaptive functioning score of 10. For example, she explained that a child whose adaptive functioning score was a 10 would need help with basic functions, like toileting, but J.W. does not. She testified that when J.W. was first tested in 2008, he produced an IQ estimate of 81 on the Test of Nonverbal Intelligence-3, with average reading and spelling scores. When he was tested again in 2009, he received an IQ estimate of 63 on the Test of Nonverbal Intelligence-3. Finally, when he was administered the full-scale Wechsler IQ test,

4

his IQ had dropped to 40. Addressing these contradictions in the testing, she made the following notations in her evaluation:

> There is a difference in the IQ and achievement scores between his first [testing in 2008] and his later intellectual/achievement testing. There is a difference in his adaptive living scores on the [Street Survival Skills Questionnaire] and his observed behavior. There is a difference in what school information there is, specifically a learning disorder, versus the test scores obtained here. There is also the question of the possibility of malingering . . . . The diagnosis of Moderate Mental Retardation is being given provisionally due to the conflict between the original and most recent IQ scores. It is felt that [J.W.] should be observed for a period of time to determine at what level he truly functions at intellectually and what signs and symptoms are observed (vs. reported and/or endorsed).

Dr. Linda Wittig, a child and forensic psychiatrist, also testified at the hearing that she evaluated J.W. on August 1, 2011 and March 11, 2011 based on the testing conducted by Dr. Wood. She testified that J.W. was having issues with attention deficit and adjustment disorder and that he functioned in the range of mental retardation based on the testing. She testified that one test conducted by Dr. Wood showed J.W. was functioning in the first grade or kindergarten range. She opined that J.W.'s mental retardation would have been present all of his life.

Dr. Wittig also testified that in her professional opinion, at the time of the robbery and despite his mental retardation, J.W. had substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. She explained that she felt J.W. understood that robbing a bank was against the law and that he had the ability to conform his conduct to the

5

law in a very basic manner, despite his mental retardation. She opined that J.W. was functioning in the mild range of mental retardation. She explained that there were several discrepancies in J.W.'s IQ function and testing, which is why she evaluated him at a mild to moderate range of mental retardation.

At the conclusion of the hearing, the trial court denied J.W.'s motion to dismiss on jurisdictional grounds and specifically found that J.W. did not lack substantial capacity to appreciate the wrongfulness of his conduct and, therefore, was not absolved of responsibility as a matter of law.

At trial, Hernandez recounted the events of the robbery and testified that each of the men appeared to be acting on their own; they were not being told what to do; and she did not hear the other two men tell J.W. to point the gun at her head or demand money from her. She acknowledged on cross-examination that she had no way of knowing what was said to J.W. before he went into the credit union.

J.W. testified in his own defense and maintained that the two other men, known to J.W. as "Money" and "Boo," approached him at an apartment complex where he hung out and threatened to kill him and his family if he did not go with them. He testified that they forced him into the car but that he did not know what the men were going to do. Once the men stopped the car, one of the men handed him a gun, told him to take it, and threatened J.W.'s family again. J.W. testified that he entered the credit union last, following the other two men inside. He

6

maintained that he never threatened Hernandez with a gun, never demanded money from her, and never jumped over the counter at the teller station. He testified that he was confused about what was happening and that he left the credit union before the other two men.

After hearing the testimony of all the witnesses, the trial court found that J.W. engaged in delinquent conduct as alleged by the State. The court rejected J.W.'s duress defense, finding that there was no credible testimony that there was a threat to J.W. or his family. Following a disposition hearing, the trial court sentenced J.W. to five years' commitment to the Texas Youth Commission, suspended, and returned him to the custody of his mother. However, because J.W. would turn eighteen before the completion of his probation, the trial court ordered that the probation supervision be transferred to an adult district court on J.W.'s eighteenth birthday. This appeal followed.

## Discussion

### A.    Jurisdiction

In his first point of error, J.W. contends that the juvenile court lacked jurisdiction to adjudicate him delinquent. He maintains that because juvenile courts have jurisdiction over children between the ages of ten and seventeen, the juvenile court did not have jurisdiction over him because he has a mental age of less than ten. The State responds that the statutes grant the juvenile court

7

jurisdiction over all children who have reached the physical or chronological age of ten, including J.W.

## 1. Standard of Review

Whether a trial court has subject-matter jurisdiction is a question of law that we review de novo. *In re R.G.*, No. 01-11-00748-CV, 2012 WL 3774430, at \*3 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012, no pet.) (citing *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007)). Issues of statutory construction also present questions of law, which are reviewed de novo. *In re J.J.*, 276 S.W.3d 171, 175 (Tex. App.—Austin 2008, pet. denied) (citing *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d. 627, 631 (Tex. 2008)). "Our primary objective in statutory construction is to give effect to the legislature's intent." *Id.* (citing *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)). "We rely on the plain meaning of a text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results that the legislature could not have intended." *Id.* (citing *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008)).

## 2. Analysis

The Juvenile Justice Code "covers the proceedings in all cases involving the delinquent conduct or conduct indicating a need for supervision engaged in by a person who was a child within the meaning of this title at the time the person

8

engaged in the conduct." TEX. FAM. CODE ANN. § 51.04(a) (West 2008). The juvenile court has exclusive, original jurisdiction over all proceedings involving a defendant who was a "child" when the alleged offense occurred. *In re N.J.A.*, 997 S.W.2d 554, 555 (Tex. 1999) (citing TEX. FAM. CODE ANN. § 51.04(a)). For the purposes of the Juvenile Justice Code, a child is "a person who is . . . ten years of age or older and under 17 years of age." TEX. FAM. CODE ANN. § 51.02(2)(A) (West Supp. 2012).

By the express terms of these statutes, the juvenile court has exclusive, original jurisdiction over all proceedings involving a person who is over the age of ten and under the age of seventeen. *See id.* §§ 51.02(2)(A), 51.04(a). "Age" is defined as "the time of life at which some particular qualification, power, or capacity arises or rests" or as "the length of an existence extending from the beginning to any given time." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 23 (11th ed. 2003). The plain meaning of section 51.02(2)(A) indicates that the Juvenile Justice Code confers jurisdiction over persons having a physical or chronological age of greater than ten and less than seventeen. Nothing in the statute suggests that the Legislature intended that the existence of jurisdiction should be determined by a person's mental age. *See* TEX. FAM. CODE ANN. § 51.02(2)(A).

Courts in other jurisdictions have rejected the concept that mental age should serve as a substitute for chronological age, when considering such things as the requisite age for execution or criminal responsibility. *See Bowling v. Commonwealth*, 224 S.W.3d 577, 583–84 (Ky. 2007) (citing *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005)) (interpreting United States Supreme Court decision, which declared unconstitutional the execution of any individual under age of eighteen at time of offense, to prohibit only execution of offenders whose chronological age was less than eighteen at time of commission of offense); *Hill v. State*, 921 So.2d 579, 584 (Fla. 2006) (citing *Roper*, 543 U.S. at 573–74, 125 S. Ct. at 1197–98) (rejecting defendant's claim that his mental and emotional age places him in category of person for whom it is unconstitutional to impose death penalty because Eighth Amendment only prohibits execution of defendants whose chronological age is below eighteen); *In re Ramon M.*, 22 Cal.3d 419, 429 (Cal. 1978) (interpreting statute, which declared that children under age of fourteen were incapable of committing crimes, absent "clear proof that at the time of committing the act charged against them, they knew its wrongfulness," to refer to chronological age rather than mental age).

The Juvenile Justice Code provides mechanisms for children who have allegedly engaged in delinquent conduct to avoid adjudication and receive treatment when mental retardation or mental illness impairs the child's fitness to

10

proceed or the child is deemed not responsible for his conduct as a result of mental disease or defect. *See* TEX. FAM. CODE ANN. §§ 55.31, 55.51 (West 2008). For example, a child is not responsible for his or her conduct "if at the time of the conduct, as a result of mental illness or mental retardation, the child lacks substantial capacity either to appreciate the wrongfulness of the child's conduct or to conform the child's conduct to the requirements of law." *Id.* § 55.51(a). When a party has alleged that a child may not be responsible for his or her conduct as a result of mental illness or mental retardation, the trial court must order the child to be examined. *Id.* § 55.51(b). Following the examination, the issue of responsibility must be tried to either the court or a jury in the adjudication hearing, proved by a preponderance of the evidence, and the court or jury must state in its findings or verdict whether the child is not responsible for his or her conduct as a result of mental illness or mental retardation. *See id.* § 55.51(c), (d), and (e). In the event that the court or the jury finds the child is not responsible for his or her conduct as a result of mental illness or mental retardation, the child "shall not be subject to proceedings under this title with respect to such conduct" other than commitment proceedings or other appropriate treatment alternatives. *Id.* § 55.51(g); *see also id.* 55.52 (West 2008).

Here, the trial court found that J.W. could appreciate the wrongfulness of his conduct—that robbery was against the law—and this finding was supported by the

11

evidence. Therefore, the mechanism created by the Legislature to allow a juvenile to avoid criminal responsibility for his or her conduct due to mental illness or mental retardation does not apply. *See id.* § 55.51. J.W. does not challenge the trial court's finding that he could appreciate the wrongfulness of his conduct, and we decline to create a new exception, based on a person's mental age, to the rule that the juvenile court has jurisdiction over a person who was, chronologically, between the ages of ten and seventeen at the time of the alleged offense.

We hold that the trial court had jurisdiction over J.W. Accordingly, we overrule J.W.'s first issue.

## B.    Lack of Responsibility

Citing United States Supreme Court cases, including *Roper v. Simmons* and *Graham v. Florida*, J.W. next contends that his mental age is less than ten and, therefore, he should not be found criminally responsible for his conduct as a matter of law. *See Roper*, 543 U.S. at 569–71, 125 S. Ct. at 1195–96; *Graham v. Florida*, 130 S. Ct. 2011, 2026–27 (2010). The State responds that the record does not support the premise of J.W.'s claims, i.e., that he has a mental age of less than ten, therefore, J.W. has not shown any basis to avoid responsibility for his conduct due to his mental retardation.

As we discussed above, nothing in the Juvenile Justice Code suggests a juvenile may be relieved of responsibility for his conduct because he may have

been functioning at a mental age below ten. The Juvenile Justice Code requires a different threshold showing before a child will be relieved of responsibility; the question turns on his ability to appreciate the wrongfulness of his conduct. *See* TEX. FAM. CODE ANN. § 55.51(a) (child not responsible for his conduct "if at the time of the conduct, as a result of mental illness or mental retardation, the child lacks substantial capacity either to appreciate the wrongfulness of the child's conduct or to conform the child's conduct to the requirements of law"). The burden is on the juvenile to prove by a preponderance of the evidence that, at the time of the incident, he lacked the capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law. TEX. FAM. CODE ANN. § 55.51(d); *see In re E.L.C.*, 656 S.W.2d 149, 150 (Tex. App.—San Antonio 1983, writ ref'd n.r.e.).

Here, the trial court found that J.W. *could* appreciate the wrongfulness of his conduct. This finding was supported by the evidence, thus, J.W. cannot be relieved of criminal responsibility under section 55.51 of the Juvenile Justice Code. However, J.W. asserts that *Graham* and other Supreme Court authority recognize that children and mentally retarded individuals must be treated differently from competent adults for purposes of sentencing and punishment. He argues that these cases support his claim that he cannot be held criminally responsible for his conduct because his mental age is less than ten. We conclude we need not reach

13

the merits of J.W.'s contentions because he failed to establish the factual premise on which this argument rests—that his mental age is in fact less than ten.

J.W. maintains that the most complete psychological testing available indicates that he was functioning at the level of a six or seven year old. But the record does not support this conclusion. Instead, the record reflects that there were great discrepancies between the test results from the tests conducted before the robbery in 2008, which indicated J.W. had an estimated IQ of 81, a tenth grade spelling level, and a fifth grade reading level, and those conducted after the robbery, which indicated that he was functioning in the moderate range of mental retardation, was "functionally illiterate," and had an IQ of 40. Dr. Wood was confident the testing reflected that J.W. was functioning in the mild range of mental retardation, which translates to a functioning level of a ten or eleven year old; however, due to the numerous discrepancies, she was not comfortable giving more than a provisional diagnosis of moderate mental retardation. Dr. Wittig also testified that J.W. was given the diagnosis of mild to moderate mental retardation because of the numerous discrepancies in his IQ function.

Dr. Wood noted that J.W.'s performance in some areas on the more recent tests, like adaptive functioning, reflected scores indicative of a six to seven year old or even a child who would need help toileting. She testified, however, that these scores did not reflect J.W.'s abilities that she observed during his evaluations.

14

Both experts testified that they were concerned about the discrepancies in the test scores, and Dr. Wood also expressed a concern in her evaluation about the possibility of malingering. She recommended that J.W. be "observed for a period of time to determine at what level he truly functions at intellectually and what signs and symptoms are observed (vs. reported and/or endorsed)." Finally, Dr. Wood concluded that the confusion and conflicts regarding J.W.'s symptoms made it difficult, if not close to impossible, to diagnose J.W. In short, the record does not demonstrate that J.W. functions at the level of a child of less than ten years old.

Because the record does not support the premise of J.W.'s argument relating to criminal responsibility—that his mental age is less than ten—we decline J.W.'s invitation to consider whether the trial court's adjudication conflicts with the Supreme Court's holdings in *Graham* and *Roper*. We overrule J.W.'s second issue.

## Conclusion

We hold that the trial court had jurisdiction to adjudicate J.W. delinquent because he was, chronologically, over the age of ten and under the age of seventeen at the time of the commission of the robbery. We further hold that the trial court did not err in finding that J.W. could be held criminally responsible for the offense. We affirm the judgment of the trial court. We dismiss all pending motions as moot.

Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.