[No. E053608. Fourth Dist., Div. Two. Nov. 15, 2012.]

In re P.A., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
P.A., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III.A. and C.2. through C.5.

**COUNSEL**

Mark J. Shusted, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KING, J.—**

## I. INTRODUCTION

Following a confrontation between two groups of students at a high school in Moreno Valley, defendant and appellant P.A. (Minor) refused to comply

with an order by a Riverside County Sheriff's deputy to disperse and return to class. When he behaved in a defiant and threatening manner toward the deputy, he was arrested.

The Riverside County District Attorney filed a petition alleging that Minor came within the jurisdiction of the juvenile court under section 602 of the Welfare and Institutions Code based on two paragraphs: Minor attempted, through threats and violence, to deter or prevent a sheriff's deputy from performing his duty, a felony (par. 1; Pen. Code, § 69), and misdemeanor resisting arrest (par. 2; Pen. Code, § 148, subd. (a)(1)). Following a contested jurisdiction hearing, the court found the allegations true.

At a subsequent disposition hearing, the court reduced the felony count to a misdemeanor. The court then declared Minor a ward of the court and placed him in the care, custody, and control of the probation officer. The court ordered Minor to be committed to juvenile hall for two days (which he had already served), to perform 50 hours of community service, and to pay a restitution fine. Minor was continued in the physical custody of his parents and placed on probation subject to numerous conditions.

On appeal, Minor requests that we review the arresting deputy's personnel records, which were produced and reviewed in camera pursuant to a *Pitchess*[1] motion, to determine whether the court erred in finding no discoverable items in the records. He also argues that we should strike the court's statement at the jurisdiction hearing of a maximum term of confinement for Minor's offenses. Finally, he challenges five conditions of his probation.

We have reviewed the records pertaining to the *Pitchess* motion and conclude that the trial court's determination was not an abuse of discretion. Because the court's statement of a maximum term of confinement was made at the jurisdiction hearing, not at the disposition hearing, we reject Minor's request to strike the statement. Regarding the probation conditions, we: reject Minor's argument regarding a condition requiring that he submit to blood, breath, or urine tests for the presence of alcohol or controlled substances; agree with Minor that a restriction on moving is unconstitutionally overbroad; and agree that certain other conditions should be modified to conform to the requirements of due process.

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*).

## II. FACTUAL SUMMARY

### A. *Prosecution Evidence*

Michael Galvan is a deputy sheriff assigned to the gang special enforcement team in Moreno Valley. On November 5, 2009, he was in uniform and assigned to extra patrol at a local high school. About 1:00 p.m., he received a call that several groups were confronting one another in the "mid-quad" area of the school. Classrooms are located approximately 25 feet from the middle of this "quad."

When he arrived at the mid-quad area, he saw approximately 200 students divided into two groups: one group of mostly Hispanic students, and another group of mostly Black students. Some students were "confronting one another, yelling back and forth. And they appeared as if they were going to fight." He described the confrontation as a "415 on school grounds."[2]

In order to avoid further confrontation between the groups, Officer Galvan and other officers attempted to disperse the crowd and get the students into their classrooms. They approached the groups and told the students to go to their classrooms. Most students complied and left the area. A few refused to disperse. He told those who remained "several times" to disperse and go to their classrooms. After a minute or so, there were still five or six students who did not leave the area. Minor was one of these.

Officer Galvan approached each of the remaining students separately and told each one individually that he or she needed to leave the area and return to his or her classroom. He asked this of Minor "several times," but Minor refused to leave. After the third time, Minor "became visibly angry and upset and began cursing." He said "the F word several times." "Basically," Officer Galvan testified, "what he was saying was, I'm not leaving."

As Officer Galvan approached Minor, Minor clenched his fists like a boxer or fighter and held them up towards his chest. He "bladed" his feet (i.e., put one foot farther back than the other) in a "fighting stance." Minor told Officer Galvan, "[Y]ou better not come any closer." Officer Galvan believed that Minor would assault him if he went any closer. Officer Galvan then quickly approached Minor, turned him around, placed him in a rear wristlock, and held him against a nearby wall. Minor became irate; he cursed, screamed, yelled, and tried to pull away from Officer Galvan's grasp.

---

[2] Penal Code section 415 makes it unlawful to: (1) fight, or challenge another to fight, in a public place; (2) maliciously and willfully disturb another person by loud and unreasonable noise; or (3) use offensive words in a public place which are inherently likely to provoke an immediate violent reaction.

Another officer came to Officer Galvan's aid. The two of them gained control of Minor's arms and placed him in handcuffs.

## B. *Defense Evidence*

Minor testified in his defense as follows. On the date of the incident, Minor was standing by a tree in front of his classroom waiting for his class to open. Two of his friends were nearby. Officer Galvan approached him and asked him to go to class. If his classroom had been open, he would have gone to class. Minor told Officer Galvan two or three times that he could not go to class because the classroom was not yet open.

When Officer Galvan repeated the request, Minor turned around and told one of his friends, "This is bullshit," and "[D]oes the officers gotta be like that?" The friend responded, "[W]hy do cops gotta be like this." At that point, his teacher opened up the classroom, and Minor started walking to his class.

Officer Galvan stopped him and said, "[C]ome here, you're being . . . placed under arrest." Minor turned around and, with his hands by his side, said, "[D]on't come closer." Minor said this because he was already by his class. Minor did not have the chance to explain that he was starting toward his class because Officer Galvan came at him, grabbed him, twisted him, and "slammed [him] against the wall." Minor asked Officer Galvan to loosen his grip, but "he did not listen." Minor tried to pull away because Officer Galvan's grip was hurting him.

Minor said he never yelled; however, his "voice and tone is pretty much always up . . . ." He also admitted to saying "the F word" once: "I was, like, man, F this." However, he believed that Officer Galvan did not hear him say that.

## III. DISCUSSION

## A. *Review of Officer Galvan's Personnel File**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## B. *Trial Court's Statement of Maximum Term of Confinement*

At the jurisdiction hearing in February 2011, the court stated that the maximum confinement with respect to paragraph 1 is three years, and the

---

*See footnote, *ante*, page 23.

maximum confinement as to paragraph 2 is four months.[4] At the disposition hearing in May 2011, the court reduced paragraph 1 to a misdemeanor pursuant to Penal Code section 17, subdivision (b). The court did not remove Minor from the physical custody of his parents and did not make any statement regarding a maximum term of confinement.

On appeal, Minor contends the court's statements at the jurisdiction hearing specifying the maximum term of confinement was error because such statements can be made only if the minor is removed from the physical custody of the minor's parents. He requests that we order the improper statements be stricken. We decline to do so.

In *In re Ali A.* (2006) 139 Cal.App.4th 569 [42 Cal.Rptr.3d 846] (*Ali A.*), the juvenile court sustained a charge against the minor of attempted robbery. He was committed to the custody of his parents under the supervision of a probation officer. (*Id.* at p. 571.) At the minor's disposition hearing, the court stated a maximum period of confinement for the minor. (*Id.* at p. 572.) Apparently, the court made this statement based upon Welfare and Institutions Code section 726, subdivision (c),[5] which provides: "If the minor is removed from the physical custody of his or her parent or guardian as the result of an order of wardship made pursuant to Section 602, the order shall specify that the minor may not be held in physical confinement for a period in excess of the maximum term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court." (See *Ali A., supra,* at p. 573; see also Cal. Rules of Court, rule 5.795(b).)

The Court of Appeal held that the trial court had no discretion to set a maximum period of confinement when, as in that case, the minor is not removed from his parents' custody. (*Ali A., supra,* 139 Cal.App.4th at p. 571.) The court explained that section 726, subdivision (c), "applies only '[i]f the minor is removed from the physical custody of his or her parent or guardian . . . .' " (*Ali A., supra,* at p. 573.) Because the minor had not been removed from his parents' custody, "the juvenile court was not required . . . to include a maximum term of confinement in its dispositional order." (*Ibid.*) Although the statement was unauthorized, the court went on to hold that the

---

[4] Although the reporter's transcript indicates that the court stated the maximum term of confinement with respect to paragraph 1 is three years, the minute order of the hearing recites that the maximum term of confinement for that paragraph is three *days*. We rely on the reporter's transcript based on the rule that "[c]onflicts between the reporter's and clerk's transcripts are generally presumed to be clerical in nature and are resolved in favor of the reporter's transcript unless the particular circumstances dictate otherwise." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 249 [19 Cal.Rptr.3d 490].)

[5] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

statement "is of no legal effect" and, "[b]ecause the minor is not prejudiced by the presence of this term, there is no basis for reversal or remand in this case." (*Id.* at p. 574, fn. omitted.)

Here, Minor relies on *Ali A.* for his assertion that the court's statement of a maximum period of confinement was error, but attempts to distinguish *Ali A.* on the issue of prejudice.

In *In re Matthew A.* (2008) 165 Cal.App.4th 537, 541 [81 Cal.Rptr.3d 119] (*Matthew A.*), the Court of Appeal also held that the trial court's statement regarding a maximum term of confinement was unauthorized. In contrast to *Ali A.*, the *Matthew A.* court directed that the statement be stricken. The court explained: "The sentencing authority of a court in almost all instances is prescribed by statutory law, as it is in this case. The statute did not empower the court to specify a term of imprisonment and that should have been the end of the matter. Yet, as other[] courts have done, this court nonetheless specified a term, namely the maximum term. Courts utilizing this technique may have the best of reasons, such as 'sending a message' to the juvenile that the transgression was serious. But if the Legislature thought that this should be done, it would have been easy to write the statute to permit this practice. We think it should cease. The criticism of this practice in prior opinions without actually ordering a correction of the disposition seems to have had little effect. Thus, our order is to strike the specification of a term of imprisonment." (*Matthew A., supra*, at p. 541.)

In each of these cases, the juvenile court's specification of a maximum term of confinement was stated in the court's dispositional order. As the *Matthew A.* court indicates, the court's authority at a disposition hearing is akin to a court's sentencing authority and prescribed by statute. (*Matthew A., supra*, 165 Cal.App.4th at p. 541.) In the absence of statutory authorization to state a maximum term of confinement *when the minor has not been removed from the parents' custody*, the court's statements exceeded the scope of its discretion. (*Ali A., supra*, 139 Cal.App.4th at p. 571.)

Here, the juvenile court did not mention a maximum term of confinement at the disposition hearing or in its dispositional order. The court's statement regarding a maximum term of confinement was made at the jurisdiction hearing. This fact distinguishes the present case from the cases discussed above.

■ The primary purpose of the jurisdiction hearing in a delinquency proceeding is to determine whether sufficient evidence exists to declare the minor a ward of the juvenile court. (§§ 701, 702; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2011) § 3.70[1], p. 3-112.) If the

court finds that the minor is a person described in section 602, the court must (unless it defers this decision until the disposition hearing) determine whether the minor's offense would be a misdemeanor or a felony if committed by an adult. (§ 702, last sentence; Cal. Rules of Court, rule 5.780(e)(5).) The court then proceeds to hold a disposition hearing. (§ 702; Cal. Rules of Court, rule 5.780(f).)

■ Significantly, the jurisdictional order is an intermediate, nonappealable order. (*In re James J.* (1986) 187 Cal.App.3d 1339, 1342 [232 Cal.Rptr. 456].) "In this sense, the order is analogous to a criminal conviction, which is appealable not at the time rendered, but after sentencing. The dispositional order is the final step in proceedings under section 602 . . . ." (*Ibid.*) Thus, at the disposition hearing the court could, as it did, change Minor's offense from a felony to a misdemeanor. It could likewise decide, as it did, to allow Minor to continue in the custody of his parents. It is at that time—when the *disposition* order is made—that the court must either state the maximum term of confinement (if the minor is removed from his parents' custody) or decline to state any term of confinement (if the minor is not removed from his parents' custody). In short, with respect to stating or not stating a maximum term of confinement, it is what happens at the disposition hearing that matters. By declining to make any statement regarding a term of confinement in conjunction with continuing Minor in his parents' custody, the court in this case acted correctly. What the court stated at the jurisdiction hearing regarding the maximum term of confinement is of no consequence. Accordingly, there was no error.

## C. *Probation Conditions*

The court placed Minor on probation subject to numerous conditions. On appeal, Minor challenges five of these conditions.[6] We will address each in turn.

### 1. *Blood and Breath Tests for the Presence of Alcohol and Controlled Substances*

Minor challenges the condition that he "[s]ubmit to chemical test(s) of blood, breath, or urine for alcohol/controlled substances, as directed by the

---

[6] Minor did not object to the probation conditions below. In his opening brief on appeal, he argues that he has not forfeited his challenges to the conditions on appeal by failing to object. He refers us to *In re Sheena K.* (2007) 40 Cal.4th 875, 888 [55 Cal.Rptr.3d 716, 153 P.3d 282] (constitutional challenge to probation condition not forfeited on appeal by failure to object) and *People v. Anderson* (2010) 50 Cal.4th 19, 26 [112 Cal.Rptr.3d 685, 235 P.3d 11] (failure to object to unauthorized sentence does not forfeit argument on appeal). The People, however, do not argue that Minor has forfeited his challenges to the probation conditions. We will therefore consider Minor's arguments.

probation officer or any law enforcement officer." In particular, he argues that he cannot be required to submit to blood and breath testing.

Minor points to section 729.3, which provides: "If a minor is found to be a person described in Section 601 or 602 and the court does not remove the minor from the physical custody of his or her parent or guardian, the court, as a condition of probation, may require the minor to submit to urine testing upon the request of a peace officer or probation officer for the purpose of determining the presence of alcohol or drugs." Because the court found Minor is a person described in section 602 and did not remove Minor from his parents' physical custody, section 729.3 appears to apply to Minor. Therefore, the court had discretion to require Minor to submit to urine testing.

■ Section 729.3 expressly refers to urine testing and makes no mention of any other manner of testing for alcohol or drugs. Minor relies on the maxim of statutory construction, *expressio unius est exclusio alterius*—" 'to express or include one thing implies the exclusion of the other . . . .' [Citation.]" (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 389 [97 Cal.Rptr.3d 464, 212 P.3d 736].) Thus, he argues, the explicit inclusion of urine testing as a probation condition implies the exclusion of testing by other means.

■ The People do not disagree with Minor's interpretation of section 729.3. They argue, however, that the court may require drug testing by breath and blood under section 730. Section 730 applies to minors who have been adjudged wards of the court under section 602. (§ 730, subd. (a).) As to such minors, subdivision (b) of section 730 provides, in part: "The court may impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced." (See *In re Kazuo G.* (1994) 22 Cal.App.4th 1, 8 [27 Cal.Rptr.2d 155].) Courts have held that this language grants courts broad discretion in establishing conditions of probation in juvenile cases. (See, e.g., *In re Tyrell J.* (1994) 8 Cal.4th 68, 81 [32 Cal.Rptr.2d 33, 876 P.2d 519], overruled on another point in *In re Jaime P.* (2006) 40 Cal.4th 128, 130 [51 Cal.Rptr.3d 430, 146 P.3d 965]; *In re Ramon M.* (2009) 178 Cal.App.4th 665, 676 [101 Cal.Rptr.3d 158]; *In re T.C.* (2009) 173 Cal.App.4th 837, 845 [93 Cal.Rptr.3d 447].) Such "discretion will not be disturbed in the absence of manifest abuse." (*In re Josh W.* (1997) 55 Cal.App.4th 1, 5 [63 Cal.Rptr.2d 701].)[7]

---

[7] The court's discretion is, of course, not unlimited. A condition of probation is invalid if " 'it "(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality . . . .'" [Citation.] Conversely, a condition of probation

 As Minor acknowledges, section 730 has been invoked to uphold probation conditions requiring wards to submit to "random drug testing" (*In re Jimi A.* (1989) 209 Cal.App.3d 482, 487–488 [257 Cal.Rptr. 147] [Fourth Dist., Div. Two]) and to submit to " 'any tests' " to determine alcohol and drug use (*In re Jose R.* (1982) 137 Cal.App.3d 269, 278–280 [186 Cal.Rptr. 898]). However, these cases, Minor points out, were decided prior to the effective date of section 729.3 and therefore did not address the effect (if any) of that statute on the broad discretion provided under section 730.[8] We must therefore determine whether the enactment of section 729.3 precludes a probation condition for alcohol and drug testing by means other than urine testing when such other means would be permissible under section 730.

 ■ " 'The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law.' [Citation.] In approaching this task, we 'must first look at the plain and commonsense meaning of the statute because it is generally the most reliable indicator of legislative intent and purpose.' [Citation.]" (*People v. Skiles* (2011) 51 Cal.4th 1178, 1185 [126 Cal.Rptr.3d 456, 253 P.3d 546].) " 'The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.] Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative

which requires or forbids conduct which is not itself criminal is valid if that conduct is reasonably related to the crime of which the defendant was convicted or to future criminality.' [Citations.]" (*In re D.G.* (2010) 187 Cal.App.4th 47, 52–53 [113 Cal.Rptr.3d 639], quoting *People v. Lent* (1975) 15 Cal.3d 481, 486 [124 Cal.Rptr. 905, 541 P.2d 545].) In addition, the juvenile court may impose a wider range of probation conditions than an adult criminal court; however, those conditions are permissible only if they are tailored specifically to meet the needs of the juvenile. (*In re D.G., supra,* at p. 53, citing *In re Tyrell J., supra,* 8 Cal.4th at p. 82.)

 In this case, Minor does not challenge the blood and breath testing condition based on these considerations. His challenge to the condition is based entirely upon the applicability of section 729.3 and that statute's omission of any reference to blood and breath testing.

 [8] Section 729.3 was enacted in 1989 and effective January 1, 1990. (Stats. 1989, ch. 1117, § 16, p. 4126.) There is one published decision decided after the enactment of section 729.3 that addressed a condition requiring "submission to chemical testing." (*In re Laylah K.* (1991) 229 Cal.App.3d 1496, 1499 [281 Cal.Rptr. 6], disapproved on another point in *In re Sade C.* (1996) 13 Cal.4th 952, 962, fn. 2, 983–984, fn. 13, 993–994, fn. 21 [55 Cal.Rptr.2d 771, 920 P.2d 716].) The court approved of the condition. Relying on section 729.3, the court stated: "Chemical testing is expressly authorized by statute in cases where the minor is not removed from parental custody." (*In re Laylah K., supra,* at p. 1502, citing § 729.3.) Because the court did not distinguish "chemical testing" from the urine testing authorized by section 729.3, it provides no meaningful guidance in the present case.

intent.' [Citation.]" (*People v. Zambia* (2011) 51 Cal.4th 965, 976–977 [127 Cal.Rptr.3d 662, 254 P.3d 965].)

■ Viewing the two statutes together and in their statutory context, it is important to note that the classes of minors the two statutes cover are not identical. Section 729.3 applies to minors described in sections 601 and 602 who have not been removed from the physical custody of the minors' parents or guardians. It is not limited to minors who have been declared wards of the court.[9] Section 730, by contrast, applies only to minors who have been adjudged wards of the court on the ground the minors are persons described in section 602; i.e., it does not apply to minors described in section 601 or to minors who are not wards of the court. In addition, section 730, unlike section 729.3, applies to minors who have been removed from the parents' custody.

■ Persons described in section 601 include minors who "persistently or habitually refuse[] to obey the reasonable and proper orders or directions of his or her parents, . . . or who [are] beyond the control of that person . . . ." (§ 601, subd. (a).) The statute also covers minors who violate an age-based curfew ordinance (§ 601, subd. (a)) or have "four or more truancies within one school year" (§ 601, subd. (b)). Persons within section 601 are commonly referred to as "status offenders" because they " 'have not committed acts which would be considered criminal if done by an adult' "; their behavior " 'is considered unacceptable solely because of their age.' [Citation.]" (*In re Michael G.* (1988) 44 Cal.3d 283, 287, fn. 2 [243 Cal.Rptr. 224, 747 P.2d 1152].)

■ A person described in section 602, by contrast, is a minor who "violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age . . . ." (§ 602, subd. (a).) In contrast to status offenders described in section 601, section 602 applies only to minors who have violated a law. (*In re Ramon M.* (1978) 22 Cal.3d 419, 422, fn. 2 [149 Cal.Rptr. 387, 584 P.2d 524].)

■ Thus, section 730 permits a court to impose "any . . . reasonable conditions" (which may include "any tests" for drugs) to the probation of minors—and only those minors—who have violated a law and, on that basis, have been adjudged wards of the court. Section 730 does *not* apply to, and thus does *not* authorize testing the blood of, minors who have not been adjudged wards of the court or who are mere status offenders. The only kind of alcohol or drug testing that can be imposed as a condition of probation for such status offenders or nonwards is urine testing under section 729.3.

---

[9] A minor described by either section 601 or section 602 may be placed on probation without being made a ward of the court. (§ 725, subd. (a).)

In this light, the two statutes do not generally appear to be in conflict because section 730, which permits the more invasive testing of blood, can be invoked only as to section 602 wards (when it is "reasonable"); for lesser offenders, only urine testing can be required (§ 729.3).

However, this distinction, while useful, is not perfect. The classes of minors described in section 729.3 and section 730 are not entirely exclusive of each other; there is a class of minors that falls within the descriptions of both statutes. This class (of which Minor is a member) is comprised of minors who: (1) are described in section 602; (2) have been adjudged wards of the court; and (3) have not been removed from the physical custody of the minors' parents or guardians. For minors who fall within the overlapping reaches of the two statutes, further analysis is required.

The maxim of statutory construction relied on by Minor—*expressio unius est exclusio alterius*—does not aid us at this point.[10] The maxim applies well to the class of minors that falls exclusively within section 729.3. As to status offenders who are not removed from the custody of their parents, for example, we agree with Minor that urine testing—and only urine testing—is authorized. The interpretation problem presented by Minor, however, is one of arguably conflicting statutes: section 729.3 appears to implicitly limit testing to urine testing for some of the minors within its purview (i.e., criminal offender wards not removed from their parents), while section 730 appears to permit other methods of testing on the same minors.

Minor argues that the legislative history regarding section 729.3, though inconclusive, supports his argument. We now turn to that history.[11]

Section 729.3 was enacted as part of Senate Bill No. 1275 of the 1989–1990 Regular Session (Senate Bill 1275). (Stats. 1989, ch. 1117, § 16, p. 4126.) The Legislature's declaration of intent regarding the bill states:

"[(a)] (1) The problem of juvenile delinquency should be addressed at its inception rather than after it has progressed to serious criminality.

"(2) The precursors of serious criminality by juveniles include incorrigibility, truancy, curfew, illiteracy, and alcohol and drug abuse. These precursors

---

[10] The maxim, *expressio unius est exclusio alterius*, "while helpful in appropriate cases, 'is no magical incantation, nor does it refer to an immutable rule. Like all such guidelines, it has many exceptions . . . . More in point here, however, is the principle that such rules shall always " 'be subordinated to the primary rule that the intent shall prevail over the letter.' " ' [Citations.]" (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 351 [45 Cal.Rptr.2d 279, 902 P.2d 297].)

[11] We grant Minor's unopposed request to take judicial notice of certain documents pertaining to the legislative history of Senate Bill No. 1275, Regular Session 1989–1990. (Evid. Code, §§ 452, subds. (b), (c), (h), 459, subd. (a).)

have been given little attention because the attention has been focused on those juveniles who are the most difficult to reform, the serious and habitual offenders.

"(3) The young offender who exhibits the symptoms of future delinquency presents the most significant potential for rehabilitation, yet this young offender has been largely ignored. This approach is a disservice to the community, the parents, and most importantly, to our youth.

"(b) In this regard, it is the intent of the Legislature to implement a program based on a different perspective and strategy toward juvenile delinquency which program is designed to reach our children before they become habitual criminals, and requires the intervention by the juvenile justice system at the earliest signs of drug abuse, gang affiliation, and other antisocial behavior. The program mandates parental involvement, drug and alcohol counseling, structured probation programs monitored for compliance, and early judicial intervention with delinquent youths. It seeks to promote the positive development of juveniles by emphasizing the enforcement of school attendance laws and the establishment of special education and socialization programs designed for the individual needs of the minor." (Stats. 1989, ch. 1117, § 1, p. 4113.)

Section 729.3 was not included in the original version of Senate Bill 1275. The original bill did include, however, a new section 625.1. (Sen. Bill 1275, § 6, p. 9, as introduced Mar. 9, 1989.) As originally introduced, the proposed language of section 625.1 provided that a minor who is taken into temporary custody "may be required to submit to chemical testing of his or her *blood or* urine for the purpose of determining the presence of alcohol or drugs *in his or her blood.*" (*Ibid.*) The proposed section 625.1 was subsequently amended to delete the italicized phrases ("blood or" and "in his or her blood"). (Sen. Bill 1275, § 10, p. 16, as amended May 1, 1989.) Section 625.1 was thus enacted to refer only to the "chemical testing of . . . urine for the purpose of determining the presence of alcohol or . . . drugs." (§ 625.1.)

In the amended version of the bill that omitted "blood" from the proposed section 625.1, proposed new section 729.3 was first added to the bill. (Sen. Bill 1275, § 21, p. 31, as amended May 1, 1989.) As initially proposed and as ultimately enacted, the statute referred only to urine testing and made no mention of blood or breath testing.

Minor contends that the deletion of blood testing from the proposal for section 625.1, which thereby limited testing under that section to urine testing, and the concurrent inclusion of proposed section 729.3 supports his

view that the Legislature intended to preclude blood testing of all minors covered by section 729.3, even if such testing is permitted under section 730. We disagree.

First, as indicated by the Legislature's declaration of intent, the focus of the bill was to *increase* governmental intervention in the lives of "our children . . . at the earliest signs of drug abuse, gang affiliation, and other antisocial behavior." (Stats. 1989, ch. 1117, § 1(b), p. 4113.) Toward this goal, the bill: requires school officials to notify a pupil's probation officer if the pupil is truant or habitually insubordinate; requires school officials to notify law enforcement authorities when a pupil engages in specified unlawful activity; permits peace officers to request chemical testing of minors taken into temporary custody; adds to the list of circumstances in which a probation officer must submit to a prosecuting attorney an affidavit that a minor has violated the law; specifies conditions to be placed on the probation of nonwards, the violation of which permits the court to adjudge the minor a ward; authorizes additional conditions on probationers (including urine testing); requires minors who commit certain drug-related offenses to complete alcohol or drug education programs; and authorizes a prosecuting attorney to file a supplemental petition based on an alleged violation of probation not amounting to a crime. (*Id.* at pp. 4113–4128; Legis. Counsel's Dig., Sen. Bill 1275, 4 Stats. 1989 (1989–1990 Reg. Sess.) Summary Dig., p. 426.) In short, the bill increased the authority, control, and oversight of courts, school officials, and governmental agencies over minors coming within the purview of the juvenile delinquency laws.[12]

Providing courts with the authority to impose a probation condition requiring urine testing, even for nonward status offenders who have not been removed from home, is consistent with the Legislature's goal of expanding governmental authority over delinquent minors. By contrast, Minor's construction of the statute—that Senate Bill 1275 effectively negated the existing authority under section 730 to impose a blood testing probation condition on juvenile offenders—is plainly inconsistent with the Legislature's intent because it would decrease the control of courts and probation officers over such minors.

Second, the deletion of blood testing from the initial version of section 625.1 does not indicate an intent to preclude blood testing as a probation condition under section 730. Although the legislative materials available to us

---

[12] According to a report from the Senate Rules Committee, Office of Senate Floor Analyses, "[t]he purpose of [Senate Bill 1275] is to give law enforcement and courts more authority to deal with minors (primarily status offenders) before they become habitual criminals." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill 1275, as amended May 30, 1989, p. 4.)

do not clearly reveal the reason the reference to blood testing in section 625.1 was removed, they do include two documents which suggest that the change was made because of doubts about the constitutionality of blood testing of minors temporarily taken into custody. This suggestion appears in the analyses of the bill prepared by or for the former Youth and Adult Correctional Agency. These reports state: "The original language of the bill would have required chemical testing of the minor's blood, an apparent constitutional rights' violation. The author [of Senate Bill 1275] amended this section to provide that the minor 'may be requested' to submit to a urine test (not blood) for alcohol or drugs." (Cal. Youth and Adult Correctional Agency, analysis of Sen. Bill 1275, June 30, 1989, p. 6; Cal. Youth and Adult Correctional Agency, Enrolled Bill Rep. on Sen. Bill 1275, Sept. 20, 1989, p. 5.)[13]

These reports suggest a belief that testing the urine of minors taken into temporary custody was constitutionally permitted but that testing the blood of such minors was not. This is the only reason that can be gleaned from the legislative history as to why blood testing was omitted from later versions of the bill. Arguably, the omission of any reference to blood testing in section 729.3 was also based on this concern. There is no reason to believe, however, that a concern for the constitutionality of blood testing under the circumstances described in sections 625.1 and 729.3 led the Legislature to withdraw the court's existing discretionary authority to require such testing for minors under section 730. Indeed, our review of numerous legislative committee reports and analyses concerning Senate Bill 1275 reveals no suggestion whatsoever that the Legislature intended to alter the court's authority under section 730.

Third, if the Legislature intended to abrogate the existing judicial authority to impose blood testing as a probation condition under section 730, it could have easily done so, but did not. Section 730 was enacted in 1961. (Stats. 1961, ch. 1616, § 2, pp. 3459, 3487.) At least one court relied on that statute to approve of a probation condition that required submission to "any test" for drug or alcohol use prior to the enactment of section 729.3 in 1989. (*In re Jose R., supra*, 137 Cal.App.3d at pp. 278–280.) If, at the time section 729.3 was enacted, the Legislature intended to abrogate *Jose R.* or limit the court's ability to impose such a condition, it could have done so by amending section 730 or otherwise making clear that blood testing was not permitted. Expressly authorizing urine testing in section 729.3 and saying nothing as to blood or breath testing does not indicate such an intent.

---

[13] In addition to deleting blood testing from section 625.1, the final version of the bill was changed to omit chemical testing as a *requirement*. Instead, a minor taken into temporary custody "may be requested to submit to voluntary chemical testing of his or her urine . . . ." (Stats. 1989, ch. 1117, § 6, p. 4117.)

 Based on the plain language of sections 729.3 and 730 and the legislative history of section 729.3, we conclude that the enactment of section 729.3 was not intended to affect the court's discretion under section 730 to impose blood or breath testing as a condition of probation when it is permissible to do so under that statute. Accordingly, we reject Minor's challenge to the probation condition requiring alcohol and drug testing by blood, breath, or urine.[14]

2.–5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The condition of probation that reads, "Obey and keep parent(s)/guardian(s) and the Probation Officer informed of whereabouts, associates, and activities," is modified to read: "Obey his parent(s)/guardian(s) and not associate with anyone or participate in any activities having been informed by the probation officer that such associates or activities are prohibited."

The condition of probation that reads, "Advise the Probation Officer of any change in address or telephone number. Not move without prior consent of the Probation Officer," is modified to read: "Advise the Probation Officer of any change in address or telephone number."

The condition of probation that reads, "Not have any direct or indirect contact with anyone known to be disapproved by parent(s)/guardian(s)/Probation Officer/staff; and any non-relative known to the minor to be on probation or parole," is modified to read: "Not have direct or indirect contact with anyone known by minor to be disapproved by parent(s)/guardian(s)/probation officer/staff."

---

[14] Minor also relies on the rule of statutory construction that a specific statutory provision controls over a general provision. (See, e.g., Civ. Code, § 3534 ["Particular expressions qualify those which are general."]; *San Francisco Taxpayers Assn. v. Board of Supervisors* (1992) 2 Cal.4th 571, 577 [7 Cal.Rptr.2d 245, 828 P.2d 147] [a general provision is controlled by one that is special].) If section 729.3 provided that the courts shall not require minors to submit to blood testing, Minor's argument would be appropriate. The specific provision (no blood testing) would clearly control over the general provision (court may impose reasonable conditions). Section 729.3, however, does not prohibit blood testing on minors; it merely authorizes urine testing. Moreover, this rule of construction "is merely an aid in determining legislative intent. It will not be applied so as to defeat legislative intent otherwise determined." (*Cal. State Employees' Assn. v. Regents of University of California* (1968) 267 Cal.App.2d 667, 670 [73 Cal.Rptr. 449].) As explained above, in enacting section 729.3, the Legislature did not intend to preclude blood testing when it is otherwise permissible under section 730.

*See footnote, *ante*, page 23.

The condition of probation that reads, "Not knowingly possess, consume, inhale, or inject any intoxicants, alcohol, narcotics, aerosol products, or other controlled substances, poisons, illegal drugs, including marijuana nor possess related paraphernalia," is modified to read: "Not knowingly possess, consume, inhale, or inject any intoxicants, alcohol, narcotics, aerosol products, or other controlled substances, poisons, illegal drugs, including marijuana, nor possess related paraphernalia except in accordance with a valid prescription."

As modified as set forth above, the judgment is affirmed.

McKinster, Acting P. J., and Richli, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 27, 2013, S207611. Kennard, J., was of the opinion that the petition should be granted.