Filed 10/18/13  In re Larry W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re LARRY W., a Person Coming Under the Juvenile Court Law. | |
| | D062607 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J231960) |
| v. | |
| LARRY W., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Michael T. Smyth and Browder A. Willis, Judges.  Affirmed and remanded with directions.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kimberley A. Donohue, Deputy Attorneys General, for Plaintiff and Respondent.

In this juvenile wardship proceeding, Larry W. (Minor) appeals from a judgment finding that he committed offenses on three different occasions, including falsely identifying himself to an officer and two distinct instances of theft from a person. He argues (1) there is insufficient evidence to support the finding that he aided and abetted the theft from one of the victims (Suzanne Cook); (2) a condition prohibiting his unsupervised presence in downtown San Diego is unconstitutionally vague because it does not specify the geographic boundaries of the prohibited area; and (3) the juvenile court was required to calculate his precommitment custody credits and specify his maximum permissible period of confinement given that he was committed to the Breaking Cycles program.

We hold the record supports the court's true finding on the Cook theft allegation. We remand the matter to the juvenile court with directions to modify the judgment so that it (1) sets forth the custody credits and maximum permissible confinement period, and (2) directs the probation department to provide Minor a written description of the geographic boundaries for purposes of the downtown San Diego restriction.

FACTUAL AND PROCEDURAL BACKGROUND

*May 16 False Identification and Information to Officer*

On May 16, 2012, Officer Linda Tousley observed Minor (age 15) walking slowly in a crosswalk and calling out to a group of high school students, even though the light had turned red for pedestrians in the crosswalk and he was holding up traffic. Officer Tousley contacted Minor and told him that she was detaining him for holding up traffic and crossing against a red light, and she was going to issue him a citation. When she

asked him for identification, he was unable to provide any. He then gave her a false name. It took Officer Tousley about one hour to obtain Minor's correct name; during her investigation Minor repeatedly insisted his name was the false name.

*July 18 Theft from Suzanne Cook*

At about 9:30 p.m. on July 18, 2012, a young male snatched a cell phone from the hand of Suzanne Cook while she was sitting near the fountain at Horton Plaza in downtown San Diego. The events surrounding the theft were described at trial by Cook and several eyewitnesses, including a security guard (Dominique Varona) and a bystander (Kevin Prill).

Cook testified that while she was sitting near the fountain she noticed a group of young males talking to her boyfriend and his friend. Because she is deaf she did not know "what was going on," and she was "glued to [her] phone." One of the males in the group snatched the phone from her hand and started running away. Other males in the group were "running with him." Cook screamed to her boyfriend, " 'Go after them, they stole my phone.' " Cook's boyfriend and other bystanders chased the thief and the others who were running away. Cook lost sight of the fleeing group as they ran around a building, and she then joined the chase.

After Cook joined the chase, she saw her boyfriend and the fleeing group stopped at a distance, and it looked like there was going to be a fight. When Cook arrived by the group, she grabbed the thief by his sweatshirt and screamed at him to return her phone. As the thief struggled to get away from her, one of the males in the group grabbed Cook's

3

shirt, which allowed the thief to escape. When Cook broke free she continued her chase until the males fled into an abandoned building.

Security guard Varona and bystander Prill saw Cook surrounded by a group of males in the street as Cook tried to get her phone back from the thief. Cook was screaming, " 'My phone, somebody got my phone, they got my phone.' " There was a lot of pushing, shoving and shouting in the group. One or more of the males was holding Cook by her clothes to prevent her from chasing another male who was running down the street, until Cook was able to break free and run after the person. During this altercation, Prill heard a male (who was not holding a phone in his hands and who was not the male running down the street) saying " 'I got the phone right here.' "

Cook testified that the person who grabbed her phone, and who she grabbed in the group of males in the street, was wearing a gray sweatshirt and gym shorts. Prill saw a male wearing a black sweatshirt and shorts running away from the group of males as Cook was being held back by the group in the street. Prill testified that he got a good look at the running male's face. When a detective later showed Prill a photograph of a suspect (Demoree Branch), Prill identified Branch as the male running away from the group.

The witnesses also described several other males who were present during the incident. Cook said there were other males running with the thief, but she could not accurately identify them because her attention was focused on the thief in the gray sweatshirt; it was dark; she was distressed; there were a lot of people there; and "everyone just ran different places." She did notice a male in an orange shirt and a

4

noticeably short male among the group of males who looked like they were going to start a fight with her boyfriend. Varona saw a male wearing an orange shirt running away from the group of males who were holding Cook back in the street, and when Cook broke free from the group Varona thought Cook was chasing the man in the orange shirt.

The prosecution presented evidence to support its theory that Minor participated in the theft along with several other males, including Branch, Calfred Moore, and Markeice Brown. As we shall delineate, this evidence included testimony showing that Cook saw Minor running from the scene with the thief; security guard Varona recognized Minor as the male wearing the orange shirt running away from the group of males holding Cook; and Minor switched shirts with Moore so that when the police arrested Minor he was no longer wearing the orange shirt.

When the police arrived at the scene of the offense, Varona told them that he saw a male running from the area, and described the male as short (about five feet, four inches tall), wearing black pants and a bright orange shirt, and with a two-inch short "Afro." About one-half hour after the offense, the police found and detained Moore and Minor at a trolley station several blocks from the scene of the offense. Moore, who was the first suspect contacted by the police, was breathing and sweating heavily and wearing an orange shirt. Minor was detained in a different area of the trolley station by another officer after a trolley patron pointed Minor out to the police. Minor was wearing faded black jeans and a white tank top or a grayish, off-white t-shirt. While Moore was being detained, he continually looked over his shoulder in the direction of Minor.

5

The police conducted a curbside lineup with Minor, Moore, and Brown.[1]  When Minor appeared before victim Cook at the lineup, Cook said, " 'He didn't steal the phone, but he ran with' " the person who stole it.[2]  When Minor appeared before security guard Varona at the curbside lineup, Varona told the police, " 'That's him.  He had an orange shirt on, the shirt was baggy.  I recognize him.  He's always down here.' "[3]  Varona explained that on several occasions he had seen Minor "hang[ing] out" with his friends in the downtown area.  When Varona viewed Moore at the lineup, Varona told the police that Moore was wearing the shirt that Minor was wearing at the time of the incident.

---

[1]     By this time the police had apparently also detained Brown.

[2]     At trial, Cook was unable to identify Minor as one of the males running with the thief.  She testified that Minor was similar in height to the short male she saw at the scene of the street altercation; however, she was not certain that Minor was the short male.  She recognized, however, that her memory at the time of the incident was better than at the time of trial.  Also, she was not certain whether the short male was involved in the offense.  She testified she first saw the short male at the street altercation; she did not know if the short male was a participant in the theft or a bystander; she ran past the short male as she chased the thief; and the short male was not running with the thief as she continued to chase him.

[3]     This description of Varona's identification of Minor was written on the curbside lineup form by Officer Mark Amancio.  At trial, Varona testified that Officer Amancio had not accurately written down what he said about Minor at the curbside lineup.  Varona testified he was unable to see anyone's faces because it was too dark; he was not certain Minor was the person running down the street because he was not able to get a good look at the runner's face; and he merely told the police that Minor's height and hair were similar to the running person in the orange shirt.  In contrast, Officer Amancio testified that Varona immediately and without hesitation identified Minor at the curbside lineup, and when Officer Amancio read his written description of the identification to Varona, Varona said it was correct and signed the form.  At trial Varona acknowledged the officer read the identification description to him and it seemed correct to Varona at the time.  Also, Varona acknowledged he saw Minor's sister in the downtown area before trial and she asked him to sign a paper "to help her brother out."

With respect to the third suspect (Brown), Varona told the police that Brown's hat and the design on his shirt matched the clothing worn by one of the males who was holding Cook back from continuing her chase to retrieve her phone.

After Minor waived his *Miranda* rights at the police station, he told Detective Eric Pollom that a group of males, including himself, Brown, Moore, and Branch, were near the Horton Plaza fountain area smoking spice (a synthetic form of marijuana). Branch grabbed Cook's cell phone and ran away, and Cook chased him and caught him. Minor went to the area and saw a group fighting in the street, but he did not join in the fight. At one point the police left Minor, Brown, and Moore together, without any officers, in an interview room equipped with audio and video recording equipment. The recording depicts Minor making a statement that appeared to be about switching shirts.[4]

*July 26 Theft from Jacob Duran*

At about 5:00 p.m. on July 26, 2012, Jacob Duran, while standing at a bus stop in downtown San Diego, was listening to music and texting on his cell phone. A man approached him and asked if he could use his phone; Duran responded he was texting someone and could not lend him the phone. The man asked a few other people around the bus stop if he could use their phones. The man then joined Minor and about four or five other males who were nearby "hanging out" and smoking marijuana. The man returned to Duran and again asked if he could use his phone. When Duran said no, the

---

4    The transcript of the recording provided on appeal includes the following exchange between Moore and Minor:
     Moore: "She [Cook] said, this nigga was wearing my shirt."
     Minor: "I know, we switched off."

male "invaded [Duran's] personal space," coming within inches of Duran's phone to look at it while Duran was talking to a friend on the phone. The man continued asking to use Duran's phone, and then (apparently to distract Duran) started asking him "stupid questions" about a bicycle that another individual had near the bus stop. The man then snatched the phone out of Duran's hand and started running away.

Minor started running with the thief, and Duran heard Minor saying, " 'You got it, you got it. Keep going, keep going.' " Duran started chasing them but lost sight of them by the mall at Horton Plaza.

When the police arrived, Duran saw Minor walking at Horton Plaza. Duran told the police that Minor was one of the males who " 'took off with the guy that took [his] phone.' " When the police took Minor into custody, he spontaneously said to the officer, " 'I didn't take anything. What are you going to charge me with, being with someone that stole a phone? This is two times for this shit with no evidence.' "

*Defense*

Minor testified on his own behalf. Regarding the Cook theft, Minor said he did not hear anyone in his group talking about taking the phone; "out of nowhere" Branch snatched the phone; he did not know Branch was going to do this; he did not help steal the phone; he did not run from the scene with Branch; he watched but did not participate in the altercation in the middle of the street; and Moore was the person who held Cook back and pretended he had the phone to help Branch get away. Minor said that when Branch broke free and started running in Minor's direction, Minor ran away so he would not be near Branch and get in trouble for something he did not do. He claimed he never

8

wore an orange shirt, and denied that he switched shirts with anyone. He testified that while being recorded in the police station interview room he said in a low voice, " 'I know we didn't switch off.' "[5]

Minor also denied that he assisted with the theft of Duran's phone. He testified that while he was waiting by the bus stop with his "play auntie" and her two young children, his "play auntie" commented that somebody was snatching a phone. Minor did not see the thief snatch the phone but saw the thief running from the scene. Minor claimed he was not "hanging out" with the thief and was not trying to help him; he did not run away with the thief; and he did not make a statement encouraging the thief to run away with the phone. As Minor was walking to the mall, Duran identified him to the police. Minor testified that when he made the comment to the police about being charged for being with someone who stole a phone, he was referring only to the Cook theft, not the Duran theft.

*Trial Court's Rulings*

In its petition to declare Minor a ward of the court (Welf. & Inst. Code,[6] § 602), the People charged Minor with grand theft from a person (count 1, victim Duran, July 26 incident); robbery and grand theft from a person (counts 2 and 3, victim Cook, July 18

---

[5]    The trial court viewed the DVD containing Minor's recorded statements in court during the prosecution's evidentiary presentation, and apparently viewed it again in the privacy of its chambers after the defense evidentiary presentation.

[6]    Subsequent unspecified statutory references are to the Welfare and Institutions Code.

incident); and falsely identifying oneself and providing false information to an officer (misdemeanor counts 4 and 5, May 16 incident).

At the jurisdiction hearing, the court found true the allegations of theft and false representations and information to an officer, but dismissed the robbery allegation. Regarding the theft offenses, the court found the males involved in the thefts had the intent and common plan to "hang out, get close, snatch a phone, run," and the males (including Minor) were serving as a distraction and a "muscle" for each other even if they were not the one grabbing the phone. With respect to Minor's participation in the Cook theft, the court credited security guard Varona's statement to the police at the curbside lineup that Minor was involved in this theft, and discredited Varona's trial testimony that he did not know if Minor was involved (see fn. 3, *ante*).

At the disposition hearing, the court declared Minor a ward of the court; ordered that he be committed to the Breaking Cycles program for a period not to exceed 150 days; and placed him on home supervision with his mother pending an assessment by the Breaking Cycles program.

## DISCUSSION

### I. *Sufficiency of Evidence of Theft from Cook*

Minor argues there is insufficient evidence to support the true finding that he aided and abetted the theft from Cook. He asserts the record does not show that he knew about the actual perpetrator's plan to take the phone, nor that he intended to, and did, assist in the taking of the phone.

10

A person is liable as an aider and abettor when he or she has knowledge of the perpetrator's unlawful purpose, intends to commit or encourage the offense, and by act or advice aids or encourages commission of the offense. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) Presence at the scene of the crime is not alone enough to establish aider and abettor status; however, it is a factor that may be considered, along with companionship with the perpetrator and conduct before and after the crime. (*Ibid*.) The requisite conduct occurs if the person in any way, directly or indirectly, aids or encourages the perpetrator by acts, words or gestures. (*Id*. at p. 411.) As to intent, the person's knowledge of the criminal purpose and failure to prevent the crime is not sufficient to show aiding and abetting; rather, the defendant must share the perpetrator's criminal purpose. (*Id.* at p. 409; *People v. Sully* (1991) 53 Cal.3d 1195, 1227.) "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.)

When reviewing a challenge to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence from which a reasonable trier of fact could find the allegations true beyond a reasonable doubt. (*In re Cesar V.* (2011) 192 Cal.App.4th 989, 994.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*Id*. at p. 995.) It is the exclusive province of the trier of fact to determine credibility and to resolve evidentiary conflicts and inconsistencies in testimony. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) A trier of

11

fact "may believe and accept as true only part of a witness's testimony and disregard the rest." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.) If the circumstances reasonably support the trier of fact's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*In re Cesar V., supra,* 192 Cal.App.4th at p. 995.)

Drawing all reasonable inferences in favor of the judgment, the record supports that the theft from Cook involved a group effort by several males, not simply by the male who actually grabbed Cook's phone, and that Minor was one of the males who participated in this group effort. Cook described a group of young males conversing with her boyfriend, the snatching of her phone by one of the males, the flight of several males, and her pursuit of the thief until she was temporarily held back by one of the males in the group. Similarly, Varona and Prill described a group of males surrounding Cook, with one or more of them briefly preventing Cook from continuing her chase of the thief. Prill testified that during this melee, one of the males in the group said he had the phone although it appeared he did not in fact have it. When testifying at trial, Minor acknowledged that one of his companions helped the thief by holding Cook back and pretending to have the phone.

As to the identity of the thief and his accomplices, Minor admitted that he, Moore, Brown, and Branch were together when Cook's phone was stolen, and Minor said Branch was the person who grabbed the phone. Cook testified that her phone was grabbed by a male in a gray sweatshirt and shorts; Prill saw a similarly dressed male (wearing a black sweatshirt and shorts) running from the group of males; and Prill later identified that male

12

as Branch. At the curbside lineup Varona identified Brown as the male holding Cook back from her chase, whereas Minor identified Moore as the male who engaged in this conduct. At the curbside lineup Cook identified Minor as one of the males running with the thief, and Varona identified Minor as the short male in the orange shirt running from the group surrounding Cook in the street. There was evidence showing that Minor and Moore ran from the scene to the trolley station, and that Minor switched shirts with Moore so that Moore was wearing the orange shirt when the police detained Minor and Moore at the trolley station.

Considering all these circumstances together, they support a finding that the theft involved the combined efforts of a group of young males, including one male grabbing the phone; another male trying to distract the victim from her efforts to retrieve her phone by pretending he had the phone; and one or more of the males impeding the victim's apprehension of the thief by holding on to her clothing. Further, the evidence supports that Minor knowingly and intentionally participated in this group effort, based on such factors as his companionship with the actual perpetrator and presence at the time of the theft; his flight with the actual perpetrator immediately after the theft; his presence during the group altercation and his flight from that group to the trolley station; and his decision to switch shirts with a companion which could evince a consciousness of guilt and an attempt to save himself from detection.

Additionally, the court was entitled to rely on the evidence associated with the theft against Duran, which supported that Minor had the intent and common plan to assist in the cell phone theft from Cook. A trier of fact may properly consider another instance

13

of misconduct if it was sufficiently similar to support a rational inference that the defendant probably harbored the same intent or plan in both instances. (*People v. Cole* (2004) 33 Cal.4th 1158, 1194; *People v. Catlin* (2001) 26 Cal.4th 81, 111, 153.) Both the Cook and Duran thefts were committed in downtown San Diego at or close to Horton Plaza, and the offenses involved the common modus operandi of a group of males "hanging out" and smoking spice or marijuana; one of the males in the group suddenly snatching a cell phone from a third party's hand; and the thief taking flight along with one or more additional males from the group joining the flight and engaging in words or conduct that encouraged the theft. The Duran and Cook thefts were sufficiently similar to support a rational inference that Minor was not simply an innocent bystander during theses offenses but rather had the same intent and plan to steal a cell phone on both occasions.

The record supports the court's finding that Minor aided and abetted the theft from Cook.

## II. *Failure To Specify Boundaries for Downtown San Diego*

One of the provisions in the trial court's dispositional order is "The Minor shall not be in downtown San Diego unless supervised by his mother." (Capitalization omitted.) Minor asserts the condition is unconstitutionally vague because the term "downtown San Diego" is not defined by concrete guidelines (such as street boundaries) to govern enforcement by the probation officer and to give notice to Minor about when he is in violation. He contends there are no agreed-upon boundaries for the area of downtown

14

San Diego, and requests that the case be remanded to the trial court to establish " 'descriptive or mapped boundaries' " for the area.

Without deciding the Attorney General's contention of forfeiture or reaching the constitutional vagueness issue on the merits, we adopt the Attorney General's suggestion that the probation department be directed to provide Minor with the geographical boundaries for downtown San Diego for purposes of this restriction. (See *In re Victor L.* (2010) 182 Cal.App.4th 902, 917-918.) We shall direct that the judgment be modified to include this requirement.

### III. *Custody Credits and Maximum Permissible Confinement*

Minor argues the trial court erred by failing to calculate his precommitment custody credits and to specify his maximum permissible period of confinement. The Attorney General asserts this was not required because Minor was not removed from the physical custody of his parents but was released to his mother.

At the disposition hearing, the court ordered that Minor be taken into custody under section 726 and committed to the Breaking Cycles program for a period not to exceed 150 days. However, the court granted a defense request to allow Minor to be assessed for the Breaking Cycles program outside of custody because he had already served a 46-day period of custody at juvenile hall. The court explained to Minor that under the Breaking Cycles program, the probation department has the discretion to send Minor to juvenile hall "tomorrow or next week" if the assessment team deems this appropriate. Pending the Breaking Cycles assessment decision, the court placed Minor on 30 days of home supervision with his mother.

15

We agree with Minor that the trial court should set forth in its dispositional order his precommitment custody credits and maximum permissible confinement period. A minor is entitled to credit against his or her maximum term of confinement for the time spent in custody before the disposition hearing. (*In re Emilio C*. (2004) 116 Cal.App.4th 1058, 1067.) Further, if the minor is removed from the physical custody of his or her parent or guardian, the court is required to specify the maximum period of confinement permitted for the offenses if they were tried as adult offenses. (§ 726, subd. (d); Cal. Rules of Court, rule 5.795(b); see *In re Julian R*. (2009) 47 Cal.4th 487, 497.) Physical confinement includes placement in a juvenile hall or camp. (§ 726, subd. (d).)

In its dispositional ruling, the trial court stated that "custody is taken pursuant to Welfare and Institutions Code section 726," and that Minor was committed to the Breaking Cycles program for a maximum of 150 days. Although the court released Minor to the custody of his mother under home supervision pending the Breaking Cycles assessment, it is apparent from the court's ruling that he could be placed *back into physical confinement without court involvement* depending on the results of the Breaking Cycles assessment. This is not a case where a minor is released to parental custody with no provision for physical confinement absent another court hearing. (See, e.g., *In re Ali A*. (2006) 139 Cal.App.4th 569, 572-573 [court's duty to specify maximum confinement term is not operative when minor is placed on probation and not removed from physical custody of parents]; *In re Matthew A*. (2008) 165 Cal.App.4th 537, 541 [same].) Given that the court's ruling contemplates the possibility of nonparental physical confinement

16

without further court order, the judgment should reference the amount of precommitment custody credits and maximum permissible confinement period.[7]

DISPOSITION

The juvenile court shall modify the judgment to include (1) an order directing the probation department to notify Minor in writing of the geographic boundaries of downtown San Diego for purposes of Minor's compliance with the terms of his release; (2) a calculation of Minor's precommitment custody credits; and (3) and specification of Minor's maximum permissible period of confinement.  In all other respects, the judgment is affirmed.

HALLER, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

---

[7]    We note that the minute order for the trial court's *jurisdictional* ruling specifies a maximum permissible term of confinement.  The appropriate procedure is for the court to specify the maximum permissible term of confinement in its *dispositional* ruling.  (*In re P.A.* (2012) 211 Cal.App.4th 23, 31-32.)  In any event, Minor does not agree with the maximum term specified in the jurisdictional minute order, and this matter can be resolved on remand.